**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRAULIO JUAN ACOSTA,

　　　　　　　　　　　*Petitioner,*

　　　　　　v.

ALBERTO R. GONZALES, Attorney
General,

　　　　　　　　　　　*Respondent.*

No. 04-72682

Agency No.
A78-740-597

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 5, 2005—Portland, Oregon

Filed February 23, 2006

Before: James R. Browning, Dorothy W. Nelson, and
Diarmuid F. O'Scannlain, Circuit Judges.

Opinion by Judge O'Scannlain

1949

## COUNSEL

Jennifer M. Rotman, Immigrant Law Group LLP, Portland, Oregon, argued the cause for the petitioner; Stephen W. Manning and Jessica M. Boell, Immigrant Law Group, Portland, Oregon, were on the briefs.

Barry Pettinato, United States Department of Justice, Washington, D.C., argued the cause for the respondent; Peter D. Keisler, M. Jocelyn Lopez Wright, and Carol Federighi, United States Department of Justice, Washington, D.C., were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether an inadmissible alien is eligible for penalty-fee adjustment of status based on marriage to a United States citizen or an extreme hardship waiver, or both.

I

Braulio Juan Acosta is a Mexican national who entered the United States without inspection in May 1993. Since his illegal entry into the country, he has returned to Mexico twice, in 1996 and 1999, both times reentering the United States without inspection.

Acosta married a United States citizen in April 2001 and applied for adjustment of status based on his marriage, filing the required paperwork and paying the $1,000 penalty fee. His application was denied because he had accrued more than one year of unlawful presence in the United States followed by an illegal reentry and was therefore permanently inadmissible.[1] Immigration and Nationality Act ("INA") § 212(a)(9)(C)(i)(I), 8 U.S.C. § 1182(a)(9)(C)(i)(I).

In late 2002, Acosta received a Notice to Appear from the Immigration and Naturalization Service ("INS"), explaining that he was subject to removal as an alien present in the United States without being admitted or paroled. At one of several hearings before the Immigration Judge ("IJ"), Acosta conceded removability but renewed his application for adjustment of status. The IJ denied the application in a May 2003 written decision based on the same inadmissibility rule. He

---

[1] As an exception to this permanent inadmissibility rule, not relevant here, an alien may obtain permission from the Attorney General to apply for admission ten years following his last departure from the United States. § 1182(a)(9)(C)(ii).

granted Acosta voluntary departure with an alternate order of removal to Mexico.

Acosta appealed that decision to the Board of Immigration Appeals ("BIA") in June 2003, which affirmed the IJ's decision without opinion. Acosta timely filed this appeal, and we exercise jurisdiction under 8 U.S.C. § 1252(a).

## II

Acosta presents two arguments on appeal. He first claims that his inadmissibility is not a bar to penalty-fee adjustment of status. Alternatively, he argues that he is eligible for § 1182(a)(9)(B)'s extreme hardship waiver. We address each of his arguments in turn.

## A

Because the BIA affirmed the IJ without opinion, "we review the IJ's decision as the final agency action." *Tapia v. Gonzales*, 430 F.3d 997, 999 (9th Cir. 2005). We review the IJ's determination of purely legal questions *de novo. Kankamalage v. INS*, 335 F.3d 858, 861 (9th Cir. 2003).

In interpreting the INA, we follow the procedure prescribed in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984); *Chowdhury v. INS*, 249 F.3d 970, 972 (9th Cir. 2001). Under *Chevron*, we first apply normal principles of statutory construction, deferring to the agency if the statute is ambiguous or uncertain. 467 U.S. at 843; *Chowdhury*, 249 F.3d at 972 (citing *Chevron*).[2] We defer

---

[2]Pursuant to *Chevron*, we start with the language of the statute itself. "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *Santiago v. Rumsfeld*, 425 F.3d 549, 558 n.8 (9th Cir. 2005). In interpreting the statute, we seek to "ascertain the congressional intent and give effect to the

to agency regulations if they are based on a permissible construction of the statute. *Akhtar v. Burzynski*, 384 F.3d 1193, 1198 (9th Cir. 2004). "Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Vigil v. Leavitt*, 381 F.3d 826, 835 (9th Cir. 2004) (quoting *Christensen*).

1

**[1]** Under the INA, any alien "who has been unlawfully present in the United States for an aggregate period of more than 1 year . . . and who enters or attempts to reenter the United States without being admitted is inadmissible." § 1182(a)(9)(C)(i)(I). Acosta concedes that he is inadmissible under this section; he accrued more than one year of unlawful presence in the United States and reentered the country without being admitted. Nevertheless, he claims eligibility for penalty-fee adjustment of status under INA § 245(i), 8 U.S.C. § 1255(i).

**[2]** Penalty-fee adjustment of status allows an alien who entered the United States without inspection to pay a fee of $1,000 and to apply for adjustment of status to that of lawful permanent resident. § 1255(i)(1). To be eligible, the alien must be the beneficiary of a petition under 8 U.S.C. § 1154 that was filed before April 30, 2001, and if such petition was filed after January 14, 1998, he must have been physically present in the country on December 21, 2000.

legislative will"; in doing so, we look to the "language and design of the statute as a whole." *United States v. Workinger*, 90 F.3d 1409, 1412 (9th Cir. 1996) (quoting *Philbrook v. Glodgett,* 421 U.S. 707, 713 (1975) and *K-Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988)) (internal quotation marks omitted).

§ 1255(i)(1)(B)-(C). If an alien satisfies these criteria, the Attorney General may "adjust the status of the alien to that of an alien lawfully admitted for permanent residence if the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and an immigrant visa is immediately available to the alien at the time the application is filed." § 1255(i)(2).

The INA does not explicitly address the issue before us. The statutes involved do not clearly indicate whether the inadmissibility provision or the penalty-fee adjustment of status provision should take precedence in Acosta's situation. We have, however, previously considered a similar question in *Perez-Gonzalez v. Ashcroft*, 379 F.3d 783, 791 (9th Cir. 2004).

### 2.

**[3]** We held in *Perez-Gonzalez* that an inadmissible alien— one who had been removed and reentered the country[3] —was nevertheless eligible for penalty-fee adjustment of status. *Id.* Acosta contends that we should follow that decision as controlling his case.[4]

---

[3]The alien's inadmissibility in *Perez-Gonzalez* was based on 8 U.S.C. § 1182(a)(9)(C)(i)(II), a companion of the provision under which Acosta is inadmissible, § 1182(a)(9)(C)(i)(I).

[4]Because *Perez-Gonzalez* was handed down after the BIA issued its decision in Acosta's case, the Government argues for a remand so that the BIA can consider the implications of that decision. In the government's view, this procedure is required in order to accord the agency the proper deference under *Chevron*. However, the BIA has already had an opportunity to interpret the statutory provision at issue in this case. Further, an agency is not owed deference when the issue is the interpretation of Circuit law rather than the statute. Consideration of Circuit law is not one of the areas "consigned to the INS's discretion in the first place." *Hughes v. Ashcroft*, 255 F.3d 752, 757 (9th Cir. 2001). We therefore find it unnecessary to remand for such consideration.

There is some merit to Acosta's argument; in *Perez-Gonzalez*, the Government argued, as it does here, that an alien inadmissible under § 1182(a)(9)(C) is ineligible for penalty-fee adjustment of status.[5] We rejected the Government's assertion that INS guidance memoranda controlled the issue. *Id.* at 791-93 & n.8. In particular, a March 31, 1997, memorandum declared—with no supporting analysis—that aliens inadmissible under this section are ineligible for penalty-fee adjustment of status. Memorandum by Paul W. Virtue, Acting Executive Assoc. Comm'r (Mar. 31, 1997). This statement was repeated in a May 1997 memorandum, which promised "further guidance" on the issue "in the near future." Memorandum by Louis D. Crocetti, Jr., Assoc. Comm'r (May 1, 1997). Despite its promise, the agency never provided any further analysis to support its conclusion.

As we noted, guidance memoranda are not entitled to the same rigorous deference due agency regulations. *Perez-Gonzalez*, 379 F.3d at 793. In fact, "guidance memoranda are entitled to respect . . . but only to the extent that those interpretations have the power to persuade." *Id.* (quoting *Christensen*, 529 U.S. at 587). After considering the purposes of the statute and its implementing regulations, we found the guidance memoranda unpersuasive. *Id.*

3

**[4]** Our reasoning in *Perez-Gonzalez* appears to control the issue now before us. We stated that "[t]he statutory terms of § 245(i) clearly extend adjustment of status to aliens living in this country without legal status." *Id.* This broad statement

---

[5]The statutory provision affects two groups of aliens. *Perez-Gonzales* concerned those from the second group—aliens who reenter the country after being removed. § 1182(a)(9)(C)(i)(II). Acosta belongs to the first group—aliens who reenter the country after accruing more than one year of unlawful presence. § 1182(a)(9)(C)(i)(I). Both classes are permanently inadmissible.

was based on a recognition that the statute's purpose is to allow relatives of permanent residents to avoid separation from their loved ones. *Id.* (citing Joint Memorandum, Statement of Senator Kennedy, 146 Cong. Rec. S11850-52 (daily ed. Dec. 15, 2000)). We held that "[n]othing in the statutory provisions regarding adjustment of status, nor in the discussion of its purposes, suggests that aliens who have been previously deported or removed are barred from this form of relief." *Id.* With respect to Acosta's case, there is also nothing to suggest that aliens who reenter the country after accruing more than one year of unlawful presence are ineligible for penalty-fee adjustment of status.

Although the Government argues otherwise, any attempt to distinguish the present case from *Perez-Gonzalez* based on the different grounds of inadmissibility involved would be unpersuasive. To do so, we would be forced to conclude, despite the lack of evidence, that Congress intended different treatment for two groups of aliens that it specifically grouped together—aliens who reentered the United States after being removed and those who reentered the country after accruing over a year of unlawful presence. Thus, although *both* of these classes are permanently inadmissible, we would be holding one group eligible for penalty-fee adjustment of status and one class ineligible. We cannot conclude that Congress intended this result, particularly when the statutes do not provide any support for the approach. We continue to believe that "the most natural reading of . . . § 245(i) permits illegal aliens . . . who can demonstrate the requisite family ties and pay the requisite fee, to apply for adjustment of status." *Id.* at 794.

As previously noted, we have already recognized penalty-fee adjustment of status is intended to prevent the needless separation of families. *Id.* at 793. As such, penalty-fee adjustment establishes "an ameliorative rule designed to forestall harsh results," and we must interpret and apply the rule in an ameliorative fashion. *Akhtar*, 384 F.3d at 1201. In the immigration context, and in Acosta's case, we must resolve doubts

in favor of the alien. *Id.* This rule provides further support for Acosta's argument that his inadmissibility does not defeat his eligibility for penalty-fee adjustment of status, particularly where it is not clear that Congress intended that harsh result.

4.

The Tenth Circuit's analysis of the issue in *Padilla-Caldera v. Gonzales*, 426 F.3d 1294 (10th Cir. 2005), also provides support. The Tenth Circuit conducted an extensive analysis of the structure, context, and history of the statutes at issue and held that an alien who has been in the United States unlawfully for more than one year is eligible for penalty-fee adjustment of status.[6] *Padilla-Caldera*, 426 F.3d at 1296. In *Padilla-Caldera* the Government argued, as it does here, that only aliens who have accrued less than a year of unlawful presence in the United States are eligible. *Id.* at 1298. In response, the court noted that "[n]othing in the text, let alone the history, of [§ 245(i)] suggests that Congress intended such a narrow application." *Id.* Much as we did in *Perez-Gonzalez*, the court recognized that Congress intended penalty-fee adjustment "to provide an exception to the general rule that aliens who entered the country without inspection are ineligible to seek adjustment to lawful permanent status." *Id.*

The court noted the presence of the savings clause in § 1182(a) which states that aliens governed by the section are inadmissible "except as otherwise provided in this chapter." *Id.* As a result, the government bore the burden of proving that penalty-fee adjustment of status did not provide an excep-

---

[6]The Fifth Circuit reached the opposite conclusion in *Mortera-Cruz v. Gonzales*, 409 F.3d 246 (5th Cir. 2005). That court based its decision in part on an analysis of *Berrum-Garcia v. Comfort*, 390 F.3d 1158 (10th Cir. 2004), which specifically rejected our approach in *Perez-Gonzalez*. *See Mortera-Cruz*, 409 F.3d at 254-56.

We are not free to consider *Mortera-Cruz* because we are bound by *Perez-Gonzalez.*

tion for inadmissibility on these grounds. *Id.* After considering the history and purpose of the statutory provisions, the court rejected the government's interpretation. In particular, Congress extended eligibility for penalty-fee adjustment three years after adding the inadmissibility provision in question. A familiar canon of statutory construction requires that " 'conflicting statutes should be interpreted so as to give effect to each but to allow a later enacted, more specific statute to amend an earlier, more general statute.' " *Id.* (quoting *Smith v. Robinson*, 468 U.S. 992, 1024 (1984)).

The Tenth Circuit also noted that the specific temporal requirements in the statute provide powerful evidence of Congress' intent. Considering the statute is intended to prevent the needless separation of families, Congress surely did not intend the result argued by the government. The court explained:

> The LIFE Act requires that aliens be "physically present in the United States on the date of the enactment of the LIFE Act Amendments of 2000." 8 U.S.C. § 1255(i)(1)(C). In other words, the statute benefits those individuals with a preexisting period of physical presence in the United States, as long as that period included the date of enactment, December 21, 2000. Therefore, the provision excludes from adjustment all entrants later than December 21, 2000.
>
> Given the date of enactment, this statutory language *requires* applicants . . . to be physically and illegally present in the United States at least four months prior to the application deadline. 8 U.S.C. § 1255(i) (requiring physical presence on December 21, 2000, and allowing applicants to file for adjustment through April 30, 2001). Therefore, the statute explicitly accepts applications from those with an unlawful presence spanning several months. *It is*

*improbable that Congress—having explicitly allowed applications for adjustment from aliens who had been in the country illegally for four months— meant to impose an absolute and infrangible bar for those who stayed for twelve by requiring the INS/ USICE to continue to superimpose the requirements of the earlier conflicting statutory provision.* Nothing in the LIFE Act indicates Congress's intent that an alien who entered the U.S. illegally on March 30, 2000, for example, would be barred from LIFE Act relief on April 1, 2001. To hold as the government would have it would mean that Congress passed the LIFE Act with the intention that it apply at the moment it was enacted only to those aliens who had been in the U.S. for no more than eight months.

*Padilla-Caldera*, 426 F.3d at 1299-1300 (second emphasis added).

We find this reasoning complementary to our rationale in *Perez-Gonzalez*. If Congress intended this statute to prevent the needless separation of loved ones, extending its application *only* to aliens who entered the country in the eight months before passage of the provision is inconsistent with that intent.[7]

5

**[5]** We therefore conclude that an alien inadmissible for accruing more than one year of unlawful presence is eligible for penalty-fee adjustment of status. Acosta is entitled to consideration of his application.

---

[7]We therefore reject the Government's attempted reliance on 8 C.F.R. § 245.10(m) which states that an alien eligible for penalty-fee adjustment of status continues to accrue unlawful presence under § 1182(a)(9)(C). We need not defer to this agency regulation because it is not based on a permissible construction of the statute. *Akhtar*, 384 F.3d at 1198.

B

Acosta also claims that he is eligible for the extreme hardship waiver of § 1182(a)(9)(B) because that section defines "unlawful presence" as used in subparagraph (C). Notwithstanding our conclusion that Acosta is eligible for adjustment of status, we must also reach the question of whether he is eligible for such waiver.

1

[6] We begin with the plain language of the statute. Section 1182(a)(9)(B) provides that an alien who has accrued between 180 days and one year of "unlawful presence" in the United States is inadmissible.[8] § 1182(a)(9)(B)(i). "Unlawful presence" accrues when an "alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." § 1182(a)(9)(B)(ii). After defining "unlawful presence," the statute provides several exceptions—the calculation of unlawful presence does not include time during which an alien is a minor, an applicant for asylum, or a beneficiary of family unity protection. § 1182(a)(9)(B)(iii)(I)-(III). An exception also completely exempts a battered spouse or children in certain circumstances. § 1182(a)(9)(B)(iii)(IV).[9] Finally:

> The Attorney General has sole discretion to waive clause (i) in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the

---

[8] The alien may seek permission to apply for admission three years after leaving the country, but an alien who accrues more than one year of unlawful presence must wait ten years. § 1182(a)(9)(B).

[9] The statute also contains a provision to toll the calculation of unlawful presence for up to 120 days in specific cases. § 1182(a)(9)(B)(iv).

> Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien. No court shall have jurisdiction to review a decision or action by the Attorney General regarding a waiver under this clause.

§ 1182(a)(9)(B)(v). Acosta argues that he is eligible for this waiver because it is incorporated into § 1182(a)(9)(C) along with the definition of "unlawful presence."

2

Acosta argues that we must read § 1182(a)(9)(B) and (C) together because Congress intended them to function jointly. Acosta contends that Congress intended to incorporate the definition of "unlawful presence" and its "descriptive elements" into both parts of the statute.

**[7]** Where Congress uses words more than once in the same statute, we presume that those words have the same meaning. *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991). We therefore presume that "unlawful presence" has the same general meaning in both parts of the statute. We do not, however, automatically presume that the exceptions and the waiver provisions are also incorporated, particularly where they are contained in separate provisions and not within the definition itself.

**[8]** Indeed, the plain text of the various exceptions and the extreme hardship waiver weigh against incorporation of anything other than "unlawful presence." These provisions include a specific reference to "clause (i)." The "battered woman" exception states that "[c]lause (i) shall not apply" to certain battered women and children, and the extreme hardship waiver states that "the Attorney General has sole discretion to waive clause (i)" in cases of extreme hardship. § 1182(a)(9)(B).

"In construing federal statutes, we presume that the ordinary meaning of the words chosen by Congress accurately express its legislative intent." *Santiago Salgado v. Garcia*, 384 F.3d 769, 771 (9th Cir. 2004) (internal quotations and citation omitted). We presume Congress intended "clause (i)" to mean "clause (i) of subparagraph (B)." Throughout the INA, Congress uses this type of reference within a statutory subdivision. When referring to a different part of the statute, Congress uses more specificity. In this instance, we cannot accept—absent evidence to the contrary—an interpretation which gives "clause (i)" other than its plain—and usual—meaning.

The clause defining "unlawful presence" supports this approach. It does not contain a reference to "clause (i)." § 1182(a)(9)(B)(ii). Instead, it defines "unlawful presence" "[f]or purposes of this paragraph," which we interpret as referring to paragraph (9) of § 1182(a). *See* § 1182(a) (referring to subdivisions of subsection (a) with the word "paragraphs"). Acosta asks us to hold in effect that "clause (i)" and "this paragraph" have the same meaning. We would think it exceedingly strange that Congress used these phrases synonymously, and we therefore decline to impose Acosta's suggested interpretative scheme.

3

The BIA's decision in *In re Garcia-Hernandez*, 23 I. & N. Dec. 590 (2003), on which Acosta relies, does not suggest a different result. In *Garcia-Hernandez*, the BIA reversed the IJ's decision that an alien convicted of a crime of moral turpitude was ineligible for cancellation of removal under 8 U.S.C. § 1229b(b). *Id.* at 593. The IJ applied the general rule declaring an alien ineligible if "convicted of an offense under section 1182(a)(2)," § 1229b(b)(1)(C), but failed to consider the clearly applicable exception. The BIA interpreted the statutory language as "incorporating the entirety of section [1182](a)(2), including the exception for petty offenses set

forth therein." *Id.* In contrast to the specific language of incorporation at issue in *Garcia-Hernandez*, there are no explicit references between the statutory sections at issue here, and for that reason *Garcia-Hernandez* is inapposite.

### 4

**[9]** Because we must reject Acosta's incorporation theory, he is ineligible for the extreme hardship waiver of § 1182(a)(9)(B).

### III

In summary, we conclude that Acosta is eligible for penalty-fee adjustment of status and thus reverse and remand the BIA's decision to the contrary. We further conclude that Acosta is not eligible for the extreme hardship waiver and affirm the BIA's decision to that extent.

**REVERSED and REMANDED in part**, **AFFIRMED in part.**