**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL NEGA HADERA,
                    *Petitioner,*

          v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 05-70496

Agency No.
A28-419-736

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 5, 2007—Seattle, Washington

Filed July 18, 2007

Before: Harry Pregerson, Warren J. Ferguson, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ferguson

8711

## COUNSEL

Signe Dortch, Gibbs Houston Pauw, Seattle, Washington, for the petitioner.

Eric W. Marsteller, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

FERGUSON, Circuit Judge:

Daniel Nega Hadera ("Hadera") petitions for review of a decision of the Board of Immigration Appeals ("BIA") summarily affirming an order of removal. Hadera argues that the Immigration Judge ("IJ") in his case erred in designating Ethiopia as his country of removal and in denying his applications for protection under the Convention Against Torture ("CAT") and withholding of removal under 8 U.S.C. § 1231(b)(3)(A).

We grant the petition and remand to the IJ for a redetermination of the country of removal under 8 U.S.C. § 1231(b)(2)(E). We do not reach Hadera's other claims.

## FACTUAL BACKGROUND

Hadera was born in Bari, Italy in 1978 to Nega Hadera and Ghidei Ghebreghiorgis, members of Ethiopia's Tigray ethnic group. Both of Hadera's parents were born in Ethiopia, though they met later in Italy, each having left Ethiopia in the

1970s. Nega Hadera's father, the petitioner's grandfather, served as a priest to Emperor Haile Selassie and was prominent throughout the Tigray province. After the Derg, a military junta, wrested command of Ethiopia from Selassie in 1974, Mengistu Haile Mariam took control of the country and targeted former Selassie supporters and members of the Ethiopian Democratic Union ("EDU"), including the Hadera family. The Mengistu regime tortured Hadera's uncles, Asfaha, Fikre, and Mulu, because of their family ties to Selassie and participation in the EDU. Nega was also a member of the EDU and actively promoted the overthrow of the Mengistu regime by distributing pamphlets to Ethiopian sailors he met in his travels as a merchant marine. The Hadera family fled Ethiopia, and Asfaha, Fikre, Mulu, and Nega were all granted asylum in the United States. The Mengistu regime was overthrown in 1991, but the Hadera family believes Ethiopia remains inhospitable to members of the EDU.

From his birth until the age of nine, Hadera lived with his mother in Italy while his father lived in the United States, working to bring the rest of the family to this country. In 1988, Hadera and his mother left Italy to join his father, who had been granted asylum in the United States. The family lived in New Jersey for several months, then moved to Seattle, where Hadera attended elementary school, middle school, and high school. In 1989, Hadera became a legal permanent resident. His mother is also a legal permanent resident and his father is a U.S. citizen.

At his July 2, 2003 hearing, Hadera testified that during his senior year of high school, he was taking Malcolm Crawford, a homeless man, out to dinner when the two were approached by an undercover Seattle police officer asking for drugs. As Hadera walked on, Crawford sold crack to the officer, then handed the money to Hadera. Hadera was arrested, charged with delivery of cocaine, and convicted under Wash. Rev. Code § 69.50.401(a)(1)(i) (1997). In October 2000, the trial judge sentenced him to forty-five months in prison, enhanced

because the drug sale had taken place in a school bus zone. Hadera had no prior criminal record. Hadera served two and a half years in prison, during which time he converted to Mormonism.

## PROCEDURAL HISTORY

After Hadera's release from prison in March 2003, the former Immigration and Naturalization Service took Hadera into custody and served him with a Notice to Appear, alleging that he was deportable as an aggravated felon under 8 U.S.C. § 1227(a)(2)(A)(iii) because he had been convicted of a drug trafficking crime.

On July 2, 2003, the IJ held a hearing at which Hadera sought a waiver of inadmissability under 8 U.S.C. § 1159(c), withholding of removal under § 1231(b)(3), and relief under CAT. Hadera argued that he would suffer persecution if removed to Ethiopia because of his status as a member of the Church of Jesus Christ of Latter-day Saints and because of his family's political connections to the EDU. Hadera asserted that he was stateless and declined to designate a country of removal. He explained that he has never been to Ethiopia, does not speak either Amharic or Tigrinya, and has no remaining relatives in Ethiopia. The IJ found Hadera removable as charged, denied his petitions for relief, and designated Ethiopia as the country of removal. The BIA affirmed without opinion.

## STANDARD OF REVIEW

Because the BIA affirmed the IJ's decision without opinion under 8 C.F.R. § 1003.1(e)(4), we review the IJ's ruling as the final agency decision. *Acosta v. Gonzales*, 439 F.3d 550, 552 (9th Cir. 2006) (citing *Tapia v. Gonzales*, 430 F.3d 997, 999 (9th Cir. 2005)). To the extent that we have jurisdiction, we review the IJ's legal determinations de novo and findings of fact for substantial evidence. *Morales v. Gonzales*, 478 F.3d

972, 977 (9th Cir. 2007). The IJ's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## DISCUSSION

**[1]** After determining that a noncitizen is removable, an IJ must assign a country of removal. The Immigration and Naturalization Act ("INA") establishes the following process for determining the country to which the individual shall be removed. 8 U.S.C. § 1231(b)(2). The noncitizen is entitled to designate a country of removal, and the Attorney General must remove him or her to that country, subject to a few exceptions. § 1231(b)(2)(A), (B), (C). If the noncitizen declines to designate a country, or if the Attorney General finds one of the exceptions applicable, then the noncitizen shall be removed "to a country of which the alien is a subject, national or citizen" unless the country fails to inform the Attorney General that it will accept the individual, or unless it is not willing to accept him or her. § 1231(b)(2)(C), (D). If the individual is not removed to his or her country of choice or citizenship, he or she shall be removed to any of the following countries:

> (i) The country from which the alien was admitted to the United States.

> (ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

> (iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

> (iv) The country in which the alien was born.

> (v) The country that had sovereignty over the alien's birthplace when the alien was born.

(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

§ 1231(b)(2)(E)(i)-(vi). If removal to any of these countries is "impracticable, inadvisable, or impossible," the individual shall be removed to "another country whose government will accept the alien into that country." § 1231(b)(2)(E)(vii).

In *Jama v. ICE*, 543 U.S. 335 (2005), the Supreme Court organized this statutory framework into a four-stage inquiry:

(1) An alien shall be removed to the country of his [or her] choice, unless one of the conditions eliminating that command is satisfied; (2) otherwise [s]he shall be removed to the country of which [s]he is a citizen, unless one of the conditions eliminating that command is satisfied; (3) otherwise [s]he shall be removed to one of the countries with which [s]he has a lesser connection; or (4) if that is impracticable, inadvisable or impossible, [s]he shall be removed to another country whose government will accept the alien into that country.

*Id.* at 341 (internal citations, parenthetical information, and punctuation omitted).

In the present case, Hadera declined to designate a country of removal, so Step 1 of the *Jama* inquiry does not apply. *See id.* at 341.

**[2]** The IJ failed to apply Step 2. Evidently believing that Hadera's failure to designate a country of removal entitled him to pick one on Hadera's behalf, the IJ stated, "Respondent declines to designate a country of removal so I will designate Ethiopia for whatever it may be worth." In order for the IJ to have removed Hadera to Ethiopia under Step 2, however, he would have had to find that Hadera was "a subject, national, or citizen" of Ethiopia. 8 U.S.C. § 1231(b)(2)(D).

The IJ made precisely the opposite finding. He stated, "I agree with respondent that it is not likely that Ethiopia would recognize him as being a citizen thereof. It may well be, as respondent argues, that he is stateless."[1] Given this conclusion, the IJ had no basis for designating Ethiopia as the country of removal under Step 2. *See* 8 U.S.C. § 1231(b)(2)(D).

**[3]** The IJ should have continued on to Step 3 and designated "one of the countries with which [Hadera] has a lesser connection." *Jama*, 543 U.S. at 341; 8 U.S.C. § 1231(b)(2)(E)(i)-(vi). As the government admits, the IJ could not have removed Hadera to Ethiopia under Step 3. Hadera has never set foot in Ethiopia. Ethiopia is not the country from which Hadera was admitted to the United States, the country in which is located the foreign port from which Hadera left for the United States, the country in which Hadera resided before entering the United States, the country from which Hadera entered the United States, the country in which Hadera was born, the country that had sovereignty over Hadera's birthplace when he was born, nor the country in which Hadera's birthplace was located when he was ordered removed. *See* § 1231(b)(2)(E)(i)-(vi). The only country that would have met any of these descriptions is Italy.

**[4]** Without having properly designated a country under Step 3, the IJ could not have determined that removal to such a country was " 'impracticable, inadvisable, or impossible,' " and he therefore could not have progressed to Step 4. *Jama*, 543 U.S. at 341 (quoting 8 U.S.C. § 1231(b)(2)(E)(vii)).

**[5]** Accordingly, the IJ erred in designating Ethiopia as the country of removal.

The government argues that there was factual support in the

---

[1]Although Hadera was born in Italy, he is not an Italian citizen. Unlike the United States, Italy does not automatically recognize as citizens all those born within its borders.

record for the IJ to conclude Hadera was a citizen of Ethiopia under Step 2. For instance, Hadera's parents listed Ethiopia as the country of his citizenship on a "statistical data" sheet it submitted in 1989 to the former INS, as well as on his application for legal permanent residency. The IJ considered these documents, however, and explicitly concluded that they did not undermine his finding that Ethiopia was unlikely to recognize Hadera as a citizen. The IJ concluded, "*Notwithstanding these statements*, I agree with respondent that it is not likely that Ethiopia would recognize him as being a citizen thereof." The IJ made a factual finding that Hadera is likely not an Ethiopian citizen, and that finding is conclusive, since a reasonable adjudicator would not "be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

The government argues that under *Pelich v. INS*, 329 F.3d 1057, 1061 (9th Cir. 2003), only the Ethiopian government can determine whether or not Hadera is a citizen. In *Pelich*, we noted that it was "eminently reasonable" for the INS to determine that Pelich was a Polish citizen based on the facts that "Pelich was born in Poland, lived there for over twenty years, and reported on his refugee application that he was a Polish national." *Id.* Under § 1231(b)(2)(D), the Attorney General must remove the noncitizen to a country of which he or she is a citizen "*unless* the government of the country . . . (i) does not inform the Attorney General . . . whether the government will accept the alien into the country; or (ii) is not willing to accept the alien into the country." 8 U.S.C. § 1231(b)(2)(D) (emphasis added). Notwithstanding the INS's reasonable determination that Pelich was a citizen of Poland, Pelich sought "to compel the INS to accept his assertion that he is ineligible for Polish citizenship," while at the same time actively obfuscating the government's attempt to obtain information as to whether Poland would accept him. *Pelich*, 329 F.3d at 1061. We rejected Pelich's efforts to short circuit the INS's efforts to follow through with Poland, noting (consistent with the statute), "it's not his place, the INS's or the court's to determine whether Poland would admit him as a cit-

izen." *Id.* We concluded that the petitioner's argument that he is ineligible for Polish citizenship was "thus somewhat premature: Until he provides the proper information, we can only speculate as to the merit of his claim." *Id.*

However, unlike the petitioner in *Pelich*, Hadera did nothing to subvert the government's determination of his actual citizenship or to prevent the government from obtaining input from Ethiopia as to whether it would accept him into the country. In the present case, the IJ himself concluded that Hadera was likely not an Ethiopian citizen, a finding that is supported by substantial evidence. Given the record before the IJ, it would not have been "eminently reasonable" for him to conclude that Hadera was an Ethiopian citizen, as it was for the IJ in *Pelich* to conclude that Pelich was a Polish citizen. *Cf. id.*

The government reads *Pelich* as holding that whenever a petitioner's country of citizenship is in question, the IJ must stop at Step 2 and *presume* the petitioner's citizenship without making a factual finding on that issue. Aside from being administratively unworkable, this reading has little support in *Pelich* itself and is inconsistent with the approach of other circuits, which permit the IJ to proceed to Step 3 if she cannot determine the petitioner's citizenship at Step 2. *See, e.g.*, *Haile v. Gonzales*, 421 F.3d 493, 496-97 (7th Cir. 2005) (remanding because IJ "did not determine whether the petitioners are still considered citizens by Ethiopia"); *Rife v. Ashcroft*, 374 F.3d 606, 610 (8th Cir. 2004) (affirming, in relevant part, IJ's order of removal of petitioners to country in which they last resided (Step 3) because they "declined to designate a country of removal [Step 1] or citizenship, and because the IJ was unable to determine with certainty the country of which [they] [we]re natives, subjects or citizens [Step 2]" (internal punctuation omitted)).

**[6]** Accordingly, the IJ acted within his powers in determining that Ethiopia was unlikely to accept Hadera as a citizen,

though he erred in nevertheless designating Ethiopia as the country of removal under Step 2. We grant Hadera's petition and remand for a redetermination of the country of removal under Step 3, § 1231(b)(2)(E)(i)-(vi).

Because we hold that Ethiopia was not the proper country of removal, we do not reach the remaining issues, each of which presumes Hadera's removal to Ethiopia. We recognize, however, that there are circumstances under which the IJ might re-designate Ethiopia as the country of removal on remand. Should the country designated under Step 3 reject Hadera or should removal under Step 3 prove to be "impracticable, inadvisable, or impossible," 8 U.S.C. § 1231(b)(2)(E)(vii), the IJ might re designate Ethiopia under Step 4.[2] Under such circumstances, Hadera's CAT and withholding of removal claims would again be applicable and subject to judicial review.

The petition is **GRANTED**.

---

[2]Of course, under Step 4, Ethiopia would have to agree in advance to accept Hadera prior to such a designation. *See* 8 U.S.C. § 1231(b)(2)(E)(vii); *Jama*, 543 U.S. at 341-42.