**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

CONCEPCION PADILLA-CALDERA,

     Petitioner,

v.

    No. 04-9573

ALBERTO R. GONZALES, United
States Attorney General,

     Respondent.

ORDER

Filed June 19, 2006

Before **HENRY**, and **LUCERO**, Circuit Judges, and **BRACK**,[*] District Court Judge.

This matter is before the court on the government's petition for rehearing. We also have a response from the petitioner. Upon consideration of those pleadings, the panel grants the petition for rehearing in part. A copy of an amended decision is attached to this order. The petition is granted to the extent of the changes found in the new opinion.

The petition for rehearing en banc was transmitted to all of the judges of the court who are in regular active service. As no member of the panel and no judge in regular

---

[*] Honorable Robert C. Brack, District Court Judge, District of New Mexico, sitting by designation.

active service on the court requested that the court be polled, that petition is denied.


Entered for the Court
ELISABETH A. SHUMAKER, Clerk of Court



By:
       Deputy Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CONCEPCION PADILLA-CALDERA,

       Petitioner,

v.

ALBERTO R. GONZALES,[*] United States
Attorney General,

       Respondent.

No. 04-9573

---

**PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS
(No. A77 781 189)**

---

Stephen W. Manning, (Lane McFee on the brief), Denver, Colorado for the Petitioner.

Thomas K. Ragiland, (Richard M. Evans, Assistant Director and Nancy E. Friedman on the brief), United States Department of Justice, Office of Immigration Litigation, Civil Division, Washington, DC for the Respondent.

---

Before **HENRY**, **LUCERO**, Circuit Judges, and **BRACK**,[**] District Court Judge.

---

**LUCERO**, Circuit Judge.

---

[*] Gonzales became Attorney General on February 4, 2005. In accordance with Fed. R. App. P. 43(c)(2), he is substituted for John Ashcroft as the respondent in this action.

[**] Honorable Robert C. Brack, District Court Judge, District of New Mexico, sitting by designation.

We examine two contradictory provisions of the Immigration Code, 8 U.S.C. § 1182(a)(9)(C)(i)(I) and 8 U.S.C. § 1255(i), to determine whether the Attorney General has the discretion to adjust the status of certain aliens who have illegally reentered the United States after having been unlawfully present in this country for an aggregate period of more than a year. We cannot follow the dictates of both sections. The Immigration Judge ("IJ") below concluded that § 1182(a)(9)(C)(i)(I) controlled and that he therefore lacked discretion to consider Concepcion Padilla-Caldera's adjustment-of-status application. The government argues that we should affirm and thus deny it discretion to consider such applications. We entertain jurisdiction under 8 U.S.C. § 1252(a) and **REVERSE**.

## I

Padilla-Caldera entered the United States illegally as a teenager in 1996 or 1997. After the passage of some time, he met Keshia Cordova, a United States citizen, and in January 1999 they were wed. In 2000, Keshia filed a "Petition for Alien Relative" to regularize her husband's immigration status, and when the Immigration and Naturalization Service ("INS") ruled favorably on the Petition, they went to Mexico to

apply for a green card, as instructed by the INS, because at that time aliens such as Padilla-Caldera had to be outside the country to apply for adjustment of status.[1]

It is ironically this departure from U.S. soil, undertaken on the INS's instruction, that put Padilla-Caldera in his present bind, seemingly barred from status-adjustment because of illegal reentry. Now, under 8 U.S.C. § 1255, one of the conflicting statutes at issue in this case, aliens who were beneficiaries of an immigrant visa petition filed, like Keshia's, after January 14, 1998, can apply for adjustment of status either from within or from without the United States. Signed into law as the Legal Immigration Family Equity Act ("LIFE Act") in December of 2000, the new 8 U.S.C. § 1255 applies to immigrant beneficiaries of visa petitions filed any time before April 30, 2001. At the time, however, § 1255 had not been extended to individuals in his position.

In Mexico, the U.S. Consulate determined that Padilla-Caldera was inadmissible under 8 U.S.C. § 1182(a)(4) for likelihood of becoming a public charge, and under 8 U.S.C. § 1182(a)(9)(B)(i)(II) for being an alien unlawfully present who again seeks admission within ten years of the date of departure or removal. The consular officer told the Padilla-Calderas that they would need to contact the INS in Denver for an I-601

---

[1] Broadly, "adjustment of status" is an application filed by an alien who is physically in the United States to adjust his or her non-immigrant status to immigrant status, i.e. permanent resident status. "Adjustment of status" and "immigrant visa" are the same thing for the purposes of the case at bar, which are simply awarded by officials in different locations.

Waiver of Ground of Excludability (granted when a U.S. citizen can cite extreme hardship where her spouse is denied legal permanent residency). The officer advised the couple that he expected to grant Padilla-Caldera an immigrant visa once the waiver was secured. Keshia then returned to Colorado only to fail to raise funds for payment of the I-601 fee. She subsequently fell ill, and called on her husband to return and render aid. Heeding his wife's plea, Padilla-Caldera reentered without inspection on May 11, 2000, and was apprehended by INS three days later.

That day, INS began removal proceedings by serving him with a Notice to Appear, alleging that he was removable under § 212(a)(6)(A)(i) of the Immigration and Nationality Act (barring aliens present without being admitted or paroled). Padilla-Caldera was released on bond. In the spring of 2003, by which time he and Keshia had a child, the United States Immigration and Customs Enforcement ("USICE") (formerly INS) contacted him and purported to offer an employment authorization card, available for pick-up. On June 2, 2003, he went into the USICE office and was arrested. He admitted before an IJ in Denver that the allegations in the Notice to Appear were true and that those admissions made him removable.

The IJ first planned to grant Padilla-Caldera an I-601 Waiver, thinking that would permit the long-awaited adjustment – but the government raised 8 U.S.C. § 1182(a)(9)(C)(i)(I), which deems inadmissible for ten years any alien who "has been

unlawfully present in the United States for an aggregate period of more than 1 year," and "who enters or attempts to reenter the United States without being admitted." Padilla-Caldera argued that he should nonetheless be allowed to adjust his status under the LIFE Act, an argument to which the government objected. Thus arose the controversy presently before us.

The LIFE Act allows certain persons who entered without inspection or otherwise violated their status, and thus are ineligible to apply for adjustment of status in the United States, to seek adjustment nonetheless if they pay a $1,000 penalty.[2] Section 1255 grants the Attorney General (through an IJ) discretion to grant adjustment of status provided that the alien is otherwise "eligible to receive an immigrant visa and is admissible to the United States for permanent residence." 8 U.S.C. § 1255(i). Because Padilla-Caldera had illegally reentered after having lived more than one year's aggregate time in the United States, the IJ agreed with the government that Padilla-Caldera was not admissible to the United States for permanent residence and was thus ineligible for relief under the LIFE Act. The Board of Immigration Appeals affirmed, adopting the IJ's decision as its own. The IJ's opinion thus became the final agency determination. See Yuk v. Ashcroft, 355

_____

[2] More specifically, the LIFE Act temporarily extends the ability to preserve eligibility for this provision of law until April 30, 2001. Use of 8 U.S.C. § 1255(i) adjustment of status previously was limited to eligible individuals who benefitted from a visa petition filed on or before January 14, 1998.

F.3d 1222, 1230 (10th Cir. 2004) ("the summary affirmance regulations specifically provide that the IJ's decision is the final agency action").

Petitioner timely petitioned for review in this court.

**II**

We review de novo the legal conclusions of the Board of Immigration Appeals. Kapcia v. INS, 944 F.2d 702, 705 (10th Cir. 1991).

Padilla-Caldera seeks relief under the LIFE Act. As noted, the statute provides that aliens who are physically present in the United States after entering without inspection, who are the beneficiaries of an adjustment petition filed before April 30, 2001, and who pay a $1,000 fee, may apply for adjustment of status. 8 U.S.C. § 1255(i)(1). The Attorney General may grant the adjustment if (A) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and (B) an immigrant visa is immediately available to the alien at the time the application is filed. Id. § 1255(i)(2). The question presented to us is whether Padilla-Caldera is "admissible to the U.S. for permanent residence" such that he may proceed with his application for adjustment of status under the LIFE Act.

Aliens who have been unlawfully present in the United States for an aggregate period of more than one year and who reenter the country illegally generally face a permanent ban on applying for admission under § 1182(a)(9)(C)(i)(I). A waiver of this

- 6 -

lifetime inadmissibility is available, but aliens must first exit the United States and wait ten years before applying for the waiver. Id. § 1182(a)(9)(C)(ii). Padilla-Caldera has not met those waiver requirements. From this premise, the government argues that Padilla-Caldera is not eligible to receive an immigrant visa under the LIFE Act amendments to the same statute.

However, there are myriad grounds of inadmissibility, and the LIFE Act was written to provide an exception to the general rule that aliens who entered the country without inspection are ineligible to seek adjustment to lawful permanent status. The permanent bar provision on which the government relies to bar Padilla-Caldera from relief under the LIFE Act has a "savings clause," which precedes the list of classes of inadmissible aliens by stating that the following classes are inadmissible "except as otherwise provided in this chapter." Id. § 1182(a). The government must therefore show, as it did with a related section in Berrum-Garcia v. Comfort, 390 F.3d 1158 (10th Cir. 2004), why § 1182(a)(9)(C)(i)(I) should be held to be free of § 1255(i)(2).

Because we are faced with two conflicting provisions of the immigration code, our foremost duty is to "ascertain the congressional intent and give effect to the legislative will," as in all cases of statutory construction. Philbrook v. Glodgett, 421 U.S. 707, 713 (1975). To ascertain congressional intent in cases of statutes in conflict, when, as here, the text itself gives no indication of which provision Congress intended to supercede the

other, we look to legislative history and the underlying policies of the statutory scheme, keeping in mind canons of statutory construction.  See Chickasaw Nation v. United States, 534 U.S. 84, 99 (2001).  The most "familiar" such canon is that "conflicting statutes should be interpreted so as to give effect to each but to allow a later enacted, more specific statute to amend an earlier, more general statute . . . ."  Smith v. Robinson, 468 U.S. 992, 1024 (1984).  The LIFE Act was signed into law in 2000.  This follows the passage of § 1182(a)(9)(C)(i)(I) by over three years.  See 104 P.L. 208 at **3009x577 (1996) (containing provisions now codified at § 1182).  Although the specific-versus-general determination can frequently be "flipped," Reames v. Oklahoma ex rel. OK Health Care Authority, 411 F.3d 1164, 1173 n.7 (10th Cir. 2005), it might be claimed to be a draw in the instant case:  both the LIFE Act, covering only immigrants otherwise eligible based on numerous criteria, and § 1182(a)(9)(C)(i)(I), covering only immigrants who have been in the country for an aggregate period of over a year, are highly specific statutes, and both squarely cover Padilla-Caldera.

The paradigmatic canon of statutory construction cited above, that the later statute trumps the earlier, cuts in Padilla-Caldera's favor.  Our analysis, however, cannot end there.  In Watt v. Alaska, 451 U.S. 259 (1981), the Court acknowledged that the case "involved two statutes each of which by its literal terms applies to the facts before us."  Id. at 266.  There, as here, the argument was made that the plain language of the later

statute controlled and thus made any resort to legislative history improper. Although the Court agreed that the statutory language was the starting point, it clarified that the clear language of the later-adopted statute does "not preclude consideration of . . . [t]he circumstances of the enactment of particular legislation" Id. (citations and footnote omitted). Following the Watt dictate, and thereby considering the circumstances of enactment in the paragraphs below, we are persuaded all the more that Congress meant the LIFE Act to trump the permanent-bar provisions of § 1182(a)(9)(C)(i)(I).

Because the LIFE Act and its amendments were developed outside the usual Senate committee process, they were not accompanied by committee reports explaining their background and purpose. Nonetheless, members of Congress who spoke in support of the LIFE Act emphasized that the overriding goal of the LIFE Act was family reunification for illegal entrants and status violators who have otherwise "played by the rules." 146 Cong. Rec. S11263-01 (daily ed. Oct. 27, 2000) (statement of Sen. Hatch) (emphasis added).[3] Another statement of the Act's goal was to allow "spouses, children,

---

[3] Accordingly, the universe of statutes potentially trumped by the LIFE Act is very narrow. The Act offers a deal: if an applicant pays a penalty fee, illegal entries and status violations are exempted. Therefore, any applicant inadmissible for an action unrelated to such violations, see, e.g., 8 U.S.C. § 1182(a)(2) (covering criminal grounds of inadmissibility), will not be helped by the LIFE Act's relief. It is only statutes rendering immigration violators inadmissible – such as § 1182(a)(6)(A) (barring aliens present without being admitted or paroled), § 1182(a)(9)(C)(i)(I) (barring aliens present after an aggregate period of illegal presence of over one year), and § 1182(a)(9)(C)(i)(II) (barring aliens present after having reentered following an order of removal) – that necessitate the
(continued...)

parents and siblings of permanent residents or U.S. citizens . . . to adjust their status in the U.S. and avoid needless separation from their loved ones."  146 Cong. Rec. S11850-52 (daily ed. Dec. 15, 2000) (statement of Sen. Kennedy).  One section of the Act specifically gives the Attorney General authority to waive non-criminal grounds of inadmissibility "to assure family unity."  § 1255(h)(2)(B).  This goal would clearly be served by allowing the Attorney General discretion to adjust Padilla-Caldera's status, thereby avoiding his separation from his wife and child.

The government argues against the foregoing conclusion by stating that it would put us in conflict with our recent decision in Berrum-Garcia, 390 F.3d at 1158.  Berrum-Garcia, however, addressed a different issue from the one before us.  In that case, the question presented was whether the LIFE Act permitted Berrum-Garcia to apply for adjustment of status despite having been "ordered removed."  Aliens who reenter after an order of removal are generally ineligible for adjustment of status under 8 U.S.C. § 1182(a)(9)(C)(i)(II).[4]  That provision deems inadmissible any alien who "has been ordered removed under section 235(b)(1) [8 U.S.C. § 1225(b)(1)], section 240 [8 U.S.C. § 1229a], or any other provision of law, and who enters or attempts to reenter the United

[3](...continued)
analysis of Congressional intent in which we engage here, and in which we engaged in Berrum-Garcia.

[4]  Subject again to § 1182(a)(9)(C)(ii)'s waiver of lifetime inadmissibility available after leaving the United States and waiting ten years.

- 10 -

States." Federal law specifically provides that "[i]f the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date [and the alien] . . . may not apply for any relief under this chapter." 8 U.S.C. § 1231(a)(5) ("the reinstatement provision").

In Berrum-Garcia, we relied on § 1231(a)(5) in holding that aliens barred by § 1182(a)(9)(C)(i)(II) from reentry could not apply for adjustment of status under § 1255(i)(1).[5] The imposition of additional punishment for those inadmissible under § 1182(a)(9)(C)(i)(II) – namely § 1231(a)(5), which bars this class of aliens from seeking "any relief" – makes § 1182(a)(9)(C)(i)(I) distinguishable. The class of aliens who

---

[5] The legislative history we relied upon in Berrum-Garcia further reveals that Congress had different intentions for the application of § 1255(i)(1) to aliens barred by § 1182(a)(9)(C)(i)(I) and § 1182(a)(9)(C)(i)(II). We noted that another clause in the LIFE Act of 2000 "specifically exempted certain Central American aliens applying for adjustment of status from the strictures of § 1231(a)(5)." Berrum-Garcia, 390 F.3d at 1164. We also noted that the House Report accompanying the 2000 amendments noted that the "intended effect was to permit 'Nicaraguan [sic], Cubans, and Haitians eligible for adjustment of status . . . [to] receive this relief despite having been previously removed under an order of removal. . . .'" Id. (quoting H.R. Rep. No. 106-1048, at 231 (2001) at *171). Neither the amendment nor the report discusses the effect of the LIFE Act on those aliens who have been unlawfully present in the United States for an aggregate period of more than one year, and who entered or attempted to reenter the United States without being admitted. Thus, the authors of the LIFE Act did not think an exemption was necessary for part of this other class of aliens, those that are deemed inadmissible under § 1182(a)(9)(C)(i)(I) presumably because 8 § 1255(i)(1) was intended to apply to all aliens deemed inadmissible under § 1182(a)(9)(C)(i)(I).

- 11 -

violate § 1182(a)(9)(C)(i)(II) are not the type of illegal entrants meant to be covered by § 1255(i)(1), those illegal entrants who, in Senator Hatch's words, otherwise "played by the rules." Instead, they are illegal entrants who violate direct court orders. In contrast, the class of aliens covered by § 1182(a)(9)(C)(i)(I) fit within the intended scope of § 1255(i)(1). That two provisions are placed near one another in the federal code does not mean they are identical; we should not allow the physical proximity of the statutory provisions to override the intent of Congress to apply § 1255(i)(1) to only one of these two classes of aliens.

In memoranda unrelated to the case at bar, the INS itself has recognized that the LIFE Act gives the Attorney General discretion to consider applications for adjustment of status despite such applications being barred by other statutes. See, e.g., Gen. Couns. Mem. (Feb. 19, 1997), "Request for Legal Opinion: The Impact of the 1996 Act on Section 245(i) of the Act," quoted in 74 No. 11 Interpreter Releases 499, 501, INS General Counsel Issues Important Opinion on EWI Eligibility for Adjustment, March 24, 1997 (concluding that inadmissibility under § 212(a)(6)(A) does not disqualify aliens from seeking adjustment of status). Although a subsequent internal INS guidance memorandum concludes without analysis that aliens subject to § 1182(a)(9)(C) "will be deemed inadmissible under that section of the Act for purposes of adjustment of status . . . ," Memorandum by Louis D. Crocetti, Jr., INS Assoc. Comm'r (May 1, 1997),

we do not owe rigorous deference to such determinations, <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000), and find the INS's conclusion unpersuasive. We see no basis upon which we may conclude that Congress intended § 1182(a)(9)(C)(i)(I) to be among those statutes that remain untouched by the LIFE Act's remedial powers. To the contrary, we conclude that Congress intended the LIFE Act to apply to aliens like Padilla-Caldera.

### III

Concepcion Padilla-Caldera found himself supposedly barred from status-adjustment on the basis of his reentry (and thus legally obliged to separate from his family) because the INS itself told him to leave the country in order to secure an immigrant visa. Nothing in the statutory provisions regarding adjustment of status, nor in Congress's discussion of its purposes, suggests that he should be barred from the possibility of relief under the LIFE Act. Aided by traditional canons of statutory construction, we resolve the statutory conflict in this case by concluding that the circumstances surrounding the passage of the LIFE Act clearly indicate that it applies to status-violators who have been in the United States for an aggregate period of over one year. We therefore **REVERSE** the decision of the Board of Immigration Appeals.