In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3942

MIGUEL LEMUS-LOSA,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

On Petition for Review of a Final Order of the
Board of Immigration Appeals.
No. A 98 724 586

ARGUED DECEMBER 9, 2008—DECIDED AUGUST 13, 2009

Before FLAUM, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Miguel Lemus-Losa is a 34-year-old
native and citizen of Mexico who is fighting removal
charges. He entered the United States without inspec-
tion in 1998 or 1999 and remained for about two years
before returning to Mexico. In 2003, Lemus-Losa again
entered the United States without inspection and has
been here ever since. When the Department of Homeland

Security ("DHS") caught up with him, it filed charges seeking his removal. By then, Lemus-Losa's father (a permanent resident) had filed a petition for adjustment of status to permanent resident on behalf of Lemus-Losa, and the petition had been approved. Unfortunately for Lemus-Losa, these petitions represent only one step along the road toward adjusted status. The critical final requirement is a current "priority date." As of the time Lemus-Losa was placed in removal proceedings, his priority date had not yet come up. In plain English, that meant that Lemus-Losa was not yet eligible to complete the process of adjusting his status.

The Immigration Judge ("IJ") initially granted Lemus-Losa a continuance to see whether his priority date would become current in the reasonably foreseeable future, but eventually the IJ concluded that even if that happened, Lemus-Losa was statutorily ineligible for permanent residence because he had accumulated more than a year of unlawful presence. Immigration and Nationality Act ("INA") § 212(a)(9)(B)(i)(II), 8 U.S.C. § 1182(a)(9)(B)(i)(II). The IJ also held that 8 U.S.C. § 1255(i)—the so-called "LIFE Act," which allows aliens illegally in the United States to adjust their status—did not change the fact of Lemus-Losa's inadmissibility because Lemus-Losa was otherwise inadmissible under § 1182(a)(9)(B)(i)(II). The Board of Immigration Appeals ("Board" or "BIA") agreed with the IJ. Because we conclude that the Board did not adequately take into account the difference between § 1182(a)(9)(B)(i)(II) and 8 U.S.C. § 1182(a)(9)(C)(i)(I), we grant Lemus-Losa's petition for review and remand the case for further proceedings.

**I**

Lemus-Losa was born in Mexico and lived there for most of his early life. In March 1992, when Lemus-Losa was 20 years old, Lemus-Losa's father became a lawful permanent resident of the United States and immediately filed a Form I-130, Petition for Alien Relative, for his children. The petition was approved on June 16, 1992; this gave Lemus-Losa a priority date of March 30, 1992. (The priority date determines the order in which the responsible agency—now DHS—assigns actual visas.) For reasons not apparent from the record, in 1998 or 1999, Lemus-Losa entered the United States without inspection. He stayed in the country unlawfully for approximately two years before returning to Mexico. In 2003, Lemus-Losa again entered the United States without inspection and has remained here since that time.

On March 14, 2005, DHS placed Lemus-Losa in removal proceedings, charging him under 8 U.S.C. § 1182(a)(6)(A)(i) with removability as an alien present without admission or parole. Lemus-Losa responded on September 29, 2005, with an Application to Register Permanent Residence or Adjust Status (Form I-485), which he filed with the Immigration Court. In his application, he asserted that he was eligible to adjust his status pursuant to the LIFE Act, § 1255(i), notwithstanding his unlawful entry, based on his approved visa petition. At a master calendar hearing on October 19, 2005, the IJ granted Lemus-Losa a two-month continuance, in the expectation that Lemus-Losa's priority date might be reached. (As of October 2005, DHS was issuing visas for aliens from Mexico in Lemus-Losa's

preference category with priority dates earlier than March 15, 1992; it later lost ground and was handling applicants with priority dates before January 15, 1992.) At the same time that he granted the continuance, the IJ warned Lemus-Losa that he might be inadmissible anyway. The IJ pointed out that under § 1182(a)(9)(B)(i)(II), an alien is inadmissible if he

> has been unlawfully present in the United States for one year or more, and . . . again seeks admission within 10 years of the date of such alien's *departure* or removal from the United States.

(Emphasis added.) Lemus-Losa, the judge thought, might fit that bill. The IJ concluded that Lemus-Losa's inadmissibility would be addressed at the next hearing and invited him to seek a hardship waiver pursuant to 8 U.S.C. § 1182(a)(9)(B)(v).

At the December 16, 2005, hearing, Lemus-Losa requested another continuance because the visa numbers in his preference category still had not become current; in fact, as we noted earlier, they had retrogressed. Lemus-Losa did not offer any argument or evidence in support of a hardship waiver. The IJ refused to grant another continuance. This time, the judge squarely decided that even if a visa were immediately available to Lemus-Losa, he was inadmissible under the terms of § 1182(a)(9)(B)(i)(II) (which we abbreviate as § (B)(i)(II) from here on).

Lemus-Losa appealed to the BIA. The Board gave Lemus-Losa's case its full attention, admitting supplemental briefs and hearing oral argument. In a published, precedential opinion, it dismissed his appeal. See *In re*

*Miguel Lemus-Losa,* 24 I. & N. Dec. 373 (BIA 2007) (cited as *Lemus-Losa (BIA)* below). The BIA began with the question whether, as a threshold matter, § (B)(i)(II) rendered Lemus-Losa inadmissible. The BIA rejected Lemus-Losa's argument that this section was inapplicable to him. Lemus-Losa had contended that the term "departure" in the section, which we have emphasized above, referred only to a departure accomplished through some kind of legal process, such as a grant of voluntary departure or permission to depart under threat of removal. Lemus-Losa had also argued that the heading of subsection (9), "Aliens previously removed," indicates that its provisions apply only to aliens who have been formally removed from the United States through some kind of removal proceeding, not to aliens who have left the country of their own volition.

The BIA was not persuaded. It held that the term "departure" in § (B)(i)(II) applied to Lemus-Losa because, in its view, the plain language of the term encompasses "any 'departure' from the United States, regardless of whether it is a voluntary departure in lieu of removal or under threat of removal, or it is a departure that is made wholly outside the context of a removal proceeding." *Lemus-Losa (BIA)* at 376-77. The BIA also held that the heading to subsection (9) did not limit its meaning. Even though, as the Board conceded, some provisions of § 1182(a)(9) "do explicitly refer to previously removed aliens," the Board observed that it is "well settled that the heading of a section cannot limit the plain meaning of the text, and it is of use only when it sheds light on some ambiguous word or phrase." *Lemus-Losa (BIA)* at 376.

Because it found the meaning of § (B)(i)(II) to be clear, the Board concluded that the section heading did not modify or otherwise explain it.

The Board then turned to what it had identified as the "principal issue" in Lemus-Losa's case: "whether an alien who is inadmissible to the United States under [§ (B)(i)(II)] may obtain adjustment of status under [the LIFE Act, § 1255(i)]." *Lemus-Losa (BIA)* at 375. It turned for guidance to its precedential opinion in *In re Briones*, 24 I. & N. Dec. 355 (BIA 2007). In *Briones,* the Board held that aliens inadmissible under a different part of the statute, § 1182(a)(9)(C)(i)(I), which covers "[a]liens unlawfully present after previous immigration violations," are ineligible for adjustment of status under § 1255(i). See 24 I. & N. Dec. at 370-71. (For the sake of readability, we abbreviate § 1182(a)(9)(C)(i)(I) as § (C)(i)(I) from here on.) Even though Lemus-Losa's case involved § (B)(i)(II), the Board found no reason to come to a different conclusion. It saw no distinction between aliens (such as Briones) who were inadmissible under § (C)(i)(I) "for making or attempting to make an illegal reentry into the United States following a prior period of more than 1 year of unlawful presence," and aliens (such as Lemus-Losa) who were inadmissible under § (B)(i)(II) because they had "accrued more than 1 year of unlawful presence, illegally reentered the country, and then sought admission through adjustment of status within the United States." *Lemus-Losa (BIA)* at 378. The Board concluded that the plain language of § 1255(i)(2)(A) "unambiguously requires an applicant for adjustment of status to prove that he is 'admissible to the United States

for permanent residence,'" and that aliens inadmissible under § (B)(i)(II) "necessarily fail to meet that requirement, absent an available waiver." *Id.* Further, the Board reaffirmed its statement in *Briones* that "in every case where Congress has extended eligibility for adjustment of status to inadmissible aliens, it has done so unambiguously," that is, by express waiver. *Id.*

The Board rejected the possibility that its conclusion that aliens inadmissible under § (B)(i)(II) are ineligible for adjustment of status under § 1255(i) might lead to absurd consequences. This was a risk, it admitted, if aliens generally inadmissible under § 1182(a)(6)(A)(I) (*i.e.*, aliens who have entered without inspection) were held to be ineligible under § 1255(i); such a holding would effectively eliminate the entire adjustment of status option. But, the Board thought, § 1182(a)(6)(A)(I) is not coextensive with either § (B)(i)(II) or § (C)(i)(I) (at issue respectively in Lemus-Losa's case and Briones's case). Unlike the latter two provisions, § 1182(a)(6)(A)(I) is not punitive in nature. It does not seek to punish persons who enter the United States without inspection. In contrast, the Board reasoned, § (B)(i)(II) is intended to punish aliens who seek admission after having previously accrued a period of unlawful presence. The Board concluded that this interpretation of § (B)(i)(II) was consistent with the purpose of § 1182(a)(9) as a whole; that purpose, it said, was "'to compound the adverse consequences of immigration violations by making it more difficult for individuals who have left the United States after committing such violations to be lawfully admitted thereafter' . . . ." *Lemus-Losa (BIA)* at 379

(quoting *In re Rodarte-Roman*, 23 I. & N. Dec. 905, 909 (BIA 2006)).

## II

Lemus-Losa's petition for review raises two issues: first, whether the Board erred in its determination that § (B)(i)(II) applied to him; and second, whether the Board correctly found that § 1255(i) is inapplicable to aliens found inadmissible under § (B)(i)(II). The Government urges us to give *Chevron* deference to the BIA's interpretation of both statutes. *Chevron, U.S.A., Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). We agree that the *Chevron* framework applies, see *Negusie v. Holder*, 129 S. Ct. 1159, 1163-64 (2009), but we hasten to add that *Chevron* does not simply hold that the agency's interpretation always prevails. Instead, we must first ask whether the language of the statute at issue is clear. If so, then we follow the plain language of the statute. If not, then we go on to consider whether the BIA's reading is a permissible one (whether or not is the one that we would have chosen). *Chevron*, 467 U.S. at 842-43. See also 8 U.S.C. § 1103(a)(1); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); 8 C.F.R. § 1003.1(a)(1).

The central question before us is whether the Board acted within its *Chevron* powers when it concluded that § (B)(i)(II) and § (C)(i)(I) were essentially equivalent. For convenience, we set forth the relevant language of each one, including the language in § 1182(a)(9) that precedes both subparts:

(a) Classes of aliens inadmissible for visas or admission. Except as otherwise provided . . . aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

. . .

(9) Aliens previously removed.

. . .

(B) Aliens unlawfully present.

(i) In general. Any alien (other than an alien lawfully admitted for permanent residence) who–

. . .

(II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

. . .

(C) Aliens unlawfully present after previous immigration violations.

(i) In general. Any alien who–

(I) has been unlawfully present in the United States for an aggregate period of more than 1 year

. . .

> and who enters or attempts to reenter the United States without being admitted is inadmissible.

8 U.S.C. § 1182(a)(9)(B)-(C).

Although a quick glance at § (B)(i)(II) and § (C)(i)(I) might leave the impression that they are redundant, we cannot leave matters there. The Supreme Court has cautioned us to read statutes carefully, see, *e.g.*, *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341-52 (2005), and it has warned against easy assumptions that differing language in two subsections of a law has the same meaning, see, *e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983). That said, one can see that both subparts of § 1182(a)(9) address the general situation of aliens who at some point have been present in the United States unlawfully. Indeed, both address the case of aliens who were unlawfully present in the United States for one year or more. But at that point, the two subparts diverge in a way that the Board did not recognize.

Before addressing these differences in detail, we must resolve a preliminary point having to do with the meaning of the term "admission" in § (B)(i)(II). Lemus-Losa argues that it refers only to formal admission to the United States, both at the time of the first entry into this country and at the time of re-entry. The alternative is to understand "admission" as a broader term that might refer to illegal entry in some contexts, and to lawful entry in others. If the term "admission" were limited to formal admissions to the United States, then Lemus-Losa would be correct that § (B)(i)(II) would not apply to

him, since he did not formally apply for admission during his first stay here (and indeed did not do so until he filed his Form I-485 on September 29, 2005). The BIA, however, found "no merit in the . . . contention that [the section] does not apply to aliens, like himself, who are not applying for admission at a foreign consulate. In fact, we have expressly concluded otherwise [in *In re Rodarte*]." *Lemus-Losa (BIA)* at 377. In fact, a closer look at *In re Rodarte-Roman*, 23 I. & N. Dec. 905 (BIA 2006), shows that it does not dispose of Lemus-Losa's claim, since it rejected only the argument that § (B)(i)(II) applies only to aliens seeking admission at the border. The Board explained that

> the term "admission" [in the INA] generally refers to adjustment of status from within the United States, as well as lawful entry at the border. . . . If the term "admission" did not include "lawful admission to permanent residence" by means of adjustment of status, then section [1182](a)(9)(B)(i)(II) would preclude an alien from acquiring lawful permanent residence through admission as an immigrant at the border, but would permit the very same alien to evade this preclusion by simply entering the United States unlawfully and applying for adjustment. We do not believe that Congress intends the Immigration and Nationality Act to be interpreted in a manner that would give aliens an incentive to enter the United States illegally.

*In re Rodarte-Roman,* 23 I. & N. Dec. at 908.

We have no reason to disagree with the Board's position that the word "admission" means different things,

depending on the particular part of the INA that is at issue. This is true despite the fact that the definition of admission in 8 U.S.C. § 1101(a)(13)(A) appears to limit the term to lawful entry. The Board has read the definition as if it were prefaced with the phrase "unless the context otherwise provides." See *In re Rosas-Ramirez*, 22 I. & N. Dec. 616, 623 (BIA 1999). We recognized this in *Abdelqadar v. Gonzales*, where we noted that to accept that the term "admission" extends beyond the statutory definition in the context of one clause "is not . . . to imply that the word must have the same meaning" in another. 413 F.3d 668, 673 (7th Cir. 2005). "[T]he whole point of contextual reading," we wrote, "is that context matters—and the context of the word 'admission' in [one part of the statute] differs substantially from its context in [another]." *Id.* at 674.

Returning, therefore, to § (B)(i)(II) and § (C)(i)(I), we reiterate that both are triggered by an initial sojourn in the United States that was unlawful. Both address the terms of re-entry. But here the similarities cease. Subpart (C)(i)(I) applies to an alien "who enters or attempts to reenter the United States without being admitted." Subpart (B)(i)(II), in contrast, speaks of an alien "who again *seeks admission* within 10 years of the date of such alien's departure or removal from the United States." Only two possibilities exist: either these two statutes cover exactly the same ground, or Congress's choice of different words means something. As we noted, we should not lightly come to the former conclusion. In fact, as we now explain, there is an important line that is being drawn, and it is a line that has significance for the kind of relief that Lemus-Losa is seeking.

The key phrase in § (B)(i)(II) is the one we have emphasized above: it applies to the alien who has sought—that is to say, asked for—admission to the United States within the 10-year window. Subpart (C)(i)(I) itself acknowledges that there must be some avenue for this kind of lawful petition for reentry, since it makes inadmissible only those who enter or attempt to reenter "without being admitted." No one is entitled to be admitted without "seeking admission" from the Attorney General or the Secretary of the Department of Homeland Security. There might be every reason to hold, as the Board did in *Briones,* that aliens inadmissible under § (C)(i)(I)—that is to say, aliens who have not legitimately sought admission to the United States after their previous immigration violations—are ineligible for adjustment of status under the LIFE Act, § 1255(i). But to equate the unlawful reentrant with someone who is "seeking admission" is another matter entirely.

With these distinctions in mind, we turn to the core of Lemus-Losa's petition: his claim that the BIA erroneously concluded that he was barred as a matter of law from taking advantage of the LIFE Act. The Board equated the inadmissibility of someone who is subject to § (C)(i)(I) with the inadmissibility of a person subject to § (B)(i)(II), without asking how the difference that we have identified between the two subparts intersects with the LIFE Act.

Other circuits that have looked at this general problem have focused only on how § (C)(i)(I) affects eligibility under the LIFE Act. Most have agreed with the Board, especially now that the Board has issued precedential

opinions on the matter. Some differences of opinion, however, may remain. Earlier, the Ninth Circuit, in *Acosta v. Gonzales*, 439 F.3d 550, 552-56 (9th Cir. 2006), and the Tenth, in *Padilla-Caldera v. Gonzales*, 453 F.3d 1237, 1242-44 (10th Cir. 2005), held that § 1182(a) recognizes the LIFE Act, § 1255(i), as an exception to the normal rule of ineligibility for adjustment of status for a person covered by § (C)(i)(I). On the other hand, again in a case involving § (C)(i)(I), the Second Circuit concluded that the statutory provisions are sufficiently ambiguous that the courts should give *Chevron* deference to the BIA's *Briones* ruling. See *Mora v. Mukasey*, 550 F.3d 231, 237-39 (2d Cir. 2008). In so ruling, the Second Circuit joined the Fifth and Sixth Circuits (both of which were also addressing § (C)(i)(I)). See *Ramirez-Canales v. Mukasey*, 517 F.3d 904, 908-10 (6th Cir. 2008); *Mortera-Cruz v. Gonzales*, 409 F.3d 246, 255-56 (5th Cir. 2005). We must decide what bearing these decisions have on the issue before us.

In *Padilla-Caldera*, the petitioner entered the United States illegally in 1996 or 1997, when he was a teenager. Some time later, he met a U.S. citizen, who he married in 1999. In 2000, she filed a Petition for Alien Relative, much like Lemus-Losa's father did. The legacy INS ruled favorably on the petition, and then Padilla-Caldera and his wife went to Mexico, as instructed by the INS. At that point, the U.S. Consulate decided that Padilla-Caldera was ineligible for adjustment of status, initially under § (B)(i)(II). The Government reasoned that he was an alien who had been present in the United States unlawfully, and he was seeking admission within ten years of the date of his departure or removal. After some

time, both Padilla-Caldera and his wife returned to the United States; Padilla-Caldera's entry was again unlawful. He was apprehended, and in his removal proceedings, he asked for relief under the LIFE Act. The IJ and the BIA held that he was not entitled to this relief as a matter of law, relying ultimately on § (C)(i)(I). The Tenth Circuit granted his petition for review and reversed.

The court began by noting that the LIFE Act "provides that aliens who are physically present in the United States after entering without inspection, who are the beneficiaries of an adjustment petition filed before April 30, 2001, and who pay a $1,000 fee, may apply for adjustment of status." 453 F.3d at 1241. It acknowledged that aliens unlawfully present in the country for an aggregate period of more than one year, who re-enter illegally, are normally inadmissible for a ten-year period, but, it wrote:

> [T]here are myriad grounds of inadmissibility, and the LIFE Act was written to provide an exception to the general rule that aliens who entered the country without inspection are ineligible to seek adjustment to lawful permanent status. The permanent bar provision on which the government relies to bar Padilla-Caldera from relief under the LIFE Act has a "savings clause," which precedes the list of classes of inadmissible aliens by stating that the following classes are inadmissible "except as otherwise provided in this chapter." [8 U.S.C.] § 1182(a).

453 F.3d at 1241. The critical language on which the court focused was the preface to § 1182(a), which says,

"*Except as otherwise provided in this Act*, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States." (Emphasis added.) Subsection (9) of § 1182(a) naturally falls under that general language. The Tenth Circuit held that the LIFE Act was something that "otherwise provided," and that it was faced with the purely legal task of reconciling two statutes. Along the way, it noted that "the overriding goal of the LIFE Act was family reunification for *illegal* entrants and status violators who have *otherwise* 'played by the rules.'" 453 F.3d at 1242 (emphasis in original). The court concluded that it saw "no basis upon which we may conclude that Congress intended [§ (C)(i)(I)] to be among those statutes that remain untouched by the LIFE Act's remedial powers. To the contrary, we conclude that Congress intended the LIFE Act to apply to aliens like Padilla-Caldera." *Id.* at 1244.

In *Acosta*, the Ninth Circuit (citing *Padilla-Caldera* with approval) came to much the same conclusion. There too, the petitioner was a Mexican national who entered the United States illegally, returned to Mexico a couple of times, and re-entered the United States without inspection (and without formally seeking readmission). The Ninth Circuit relied on its earlier decision in *Perez-Gonzalez v. Ashcroft*, 379 F.3d 783, 793 (9th Cir. 2004), in which it had observed that "[n]othing in the statutory provisions regarding adjustment of status, nor in the discussion of its purposes, suggests that aliens who have been previously deported or removed are barred from this form of relief." Applying similar logic to

Acosta's case, the court decided that "there is also nothing to suggest that aliens who reenter the country after accruing more than one year of unlawful presence are ineligible for penalty-fee adjustment of status." 439 F.3d at 554. In a later decision, the Ninth Circuit emphasized that *Perez-Gonzalez* rested on a finding of ambiguity in the statutes; in light of the Board's new pronouncement in *In re Torres-Garcia*, 23 I. & N. Dec. 866 (BIA 2006), it concluded that *Perez-Gonzalez* was no longer good law. See *Gonzales v. Department of Homeland Security*, 508 F.3d 1227, 1236-42 (9th Cir. 2007).

In *Mora,* the Second Circuit took note of the Ninth Circuit's later *Gonzalez* decision and concluded that it substantially undermined *Acosta.* It read the Tenth Circuit's decision in *Padilla-Caldera* as one that also assumed statutory ambiguity. It summarized the BIA's actions as follows:

> Subsequent to the Tenth Circuit's decision in *Padilla-Caldera* and the BIA's rejection of the Moras' appeal in this case, the agency decided *In re Briones*, 24 I. & N. Dec. 355 (BIA 2007), in which it determined for the first time in a published opinion that, even though aliens who are inadmissible under section 1182(a)(6)(A)(i) may be eligible for adjustment of status under section 1255(i) by operation of section 1182(a)'s savings clause, aliens who are inadmissible also under section 1182(a)(9)(C)(i)(I) are not.

550 F.3d at 237. It concluded that the statutory language was ambiguous; that the precise reach of § 1255(i) is an

issue for the agency to resolve; and that, at least as it applies to § (C)(i)(I), the BIA's decision to withhold relief under § 1255(i) to recidivists (that is, aliens who repeatedly enter the country illegally) was reasonable.

If the question before us were the same as the one that our sister circuits have confronted—namely, the relation between § (C)(i)(I) and § 1255(i)—we would agree that there is sufficient ambiguity in these provisions to require *Chevron* deference, and we would find that the BIA has drawn a rational line. But our issue is not the same. We must decide instead whether the BIA was entitled to equate aliens inadmissible under § (C)(i)(I) and aliens like Lemus-Losa who are inadmissible under § (B)(i)(II). In order to do this, we must look more carefully at two additional parts of the INA: 8 U.S.C. § 1182(a)(6)(A)(i) and the LIFE Act, § 1255(i). The former statute reads as follows:

> (6) Illegal entrants and immigration violators.
>
> > (A) Aliens present without admission or parole.
> >
> > > (i) In general. An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

8 U.S.C. § 1182(a)(6)(A)(i). The LIFE Act appears in a section of the law devoted to the adjustment of status of a nonimmigrant to that of a person admitted for permanent residence; its pertinent provisions are these:

(i) Adjustment in status of certain aliens physically present in United States.

(1) Notwithstanding the provisions of subsections (a) and (c) of this section, an alien physically present in the United States–

(A) who–

(i) entered the United States without inspection; or

(ii) is within one of the classes enumerated in subsection (c) of this section;

(B) who is the beneficiary (including a spouse or child of the principal alien, if eligible to receive a visa under section [1153(d) of this title]) of–

(i) a petition for classification under section [1154 of this title] that was filed with the Attorney General on or before April 30, 2001; or

(ii) an application for a labor certification under section [1182(a)(5)(A) of this title] that was filed pursuant to the regulations of the Secretary of Labor on or before such date; and

(C) who, in the case of a beneficiary of a petition for classification, or an application for labor certification, described in subparagraph (B) that was filed after January 14, 1998, is physically present in the United States on [December 21, 2000];

may apply to the Attorney General for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence.

8 U.S.C. § 1255(i).

To state the obvious, the LIFE Act applies to aliens who are illegally present in the United States (that is, who "entered the United States without inspection" or who are in the class described by 8 U.S.C. § 1255(c), which includes "[a]lien crewmen, aliens continuing or accepting unauthorized employment, and aliens admitted in transit without a visa"). And 8 U.S.C. § 1182(a)(6)(A)(i) states that aliens who enter without inspection (that is, illegally) are "inadmissible." Yet, under the LIFE Act, the Attorney General may adjust the status of an alien after finding that "the alien is eligible to receive an immigrant visa and is *admissible* to the United States for permanent residence." 8 U.S.C. § 1255(i)(2)(A) (emphasis added). The word "admissible" in that provision cannot mean something like "not inadmissible for any reason." If it did, then no one would be eligible for adjustment of status under the LIFE Act, and the absurd situation that Lemus-Losa feared would come to pass. It must instead refer to a subset of the aliens who are inadmissible under the statute. In other words, the effect of the LIFE Act is to permit adjustment of status for a certain group of otherwise inadmissible aliens, and to draw a line between those whose ground of inadmissibility does not preclude a finding that the person is "admissible to the United States for permanent residence" and those whose ground of inadmissibility does preclude such a finding.

Here is where the difference between § (B)(i)(II) and § (C)(i)(I) becomes important. Anyone who is categorically inadmissible at the time he or she files for LIFE Act adjustment cannot receive relief under the Act. That group would include everyone from aggravated felons to those who have attempted on more than one occasion to enter the United States illegally—the recidivists described by § (C)(i)(I). But if someone is "seeking admission" to the United States on that second occasion and has thus demonstrated that he is willing to play by the rules, he is no different from the alien who is physically present in the United States "without inspection" but who is entitled to apply for LIFE Act relief. This interpretation gives deference to the Board's *Briones* decision, which construes § (C)(i)(I), while at the same time it takes into account the difference in statutory language that we find in § (B)(i)(II).

## III

As we stated at the outset, the Board did not pay sufficient heed to the difference between § (B)(i)(II), the statute involved in the proceeding against Lemus-Losa, and § (C)(i)(I), the statute involved in *Briones* and the decisions from our sister circuits. This was an error of law and thus something within our jurisdiction to address. We see no need to give extensive treatment, at this time, to Lemus-Losa's alternative argument, which is that the inadmissibility rule of § (B)(i)(II) should not apply to him because he was never formally removed from the United States, and the language of that section

addresses only aliens who have returned in spite of such an order of removal.

We GRANT the petition for review and REMAND this matter to the Board of Immigration Appeals for further proceedings.