PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1176
_____

SHIREESHA REDDY CHERUKU[1],
                                    Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
                                    Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A078-722-997
(U.S. Immigration Judge: Honorable Eugene Pugliese)
_____

Argued May 24, 2011

---

[1] According to the I-485 adjustment of status application, the petitioner's full name is "Shireesha Reddy Cheruku," not "Reddy Shireesha" as the IJ and BIA both stated in their respective decisions. (A.R. 82, 86). We therefore amend the caption and will refer to the petitioner by her last name, Cheruku.

Before:  McKEE, *Chief Judge*,
SCIRICA and RENDELL, *Circuit Judges*.

(Filed: September 22, 2011)

EDWARD J. CUCCIA, ESQUIRE (ARGUED)
Ferro & Cuccia
100 Lafayette Street, Suite 201
New York, New York 10013
        Attorney for Petitioner

PATRICK J. GLEN, ESQUIRE (ARGUED)
BENJAMIN ZEITLIN, ESQUIRE
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
        Attorneys for Respondent

_____

OPINION OF THE COURT
_____


SCIRICA, *Circuit Judge*.

Reddy Cheruku filed a petition for review of the BIA's decision affirming denial of her application to adjust her status to that of a lawful permanent resident under the Legal Immigration Family Equity Act, 8 U.S.C. § 1255(i), because she was found inadmissible under 8 U.S.C. § 1182(a)(9)(B)(i)(II).  We will deny the petition for review.

# I.

The facts are undisputed. Cheruku, a citizen of India, entered the United States in 1995 on a B-1 visa, which she subsequently overstayed. After her visa expired, she accrued more than one year of unlawful presence in the United States. In 1998, Cheruku and her employer filed an application for labor certification that was approved in March 1999. Her employer then filed a Petition for Alien Worker that was granted on November 29, 2000. On December 21, 2001, Cheruku applied to adjust her immigration status to that of a lawful permanent resident under the Legal Immigration Family Equity Act, 8 U.S.C. § 1255(i) (LIFE Act).

While her application for adjustment of status was pending, Cheruku applied for and was granted an advanced parole.[2] The advanced parole document issued to Cheruku warned that if she accrued more than 180 days of unlawful presence subsequent to April 1, 1997, and subsequent to applying for adjustment of status, and then departed the United States, she "may be found inadmissible under section 212(a)(9)(B)(i) [8 U.S.C.§ 1182(a)(9)(B)(i)] of the Act when [she] return[s] to the United States to resume the processing of [her] application." Notwithstanding this warning, Cheruku traveled outside the United States and used the advanced

---

[2] Advanced parole permits an alien temporarily to remain in "the United States pending a decision regarding his application for admission." *Bamba v. Rile*, 366 F.3d 195, 196 n.2 (3d Cir. 2004). When used to enter the United States initially or after travel, "'this amounts to permission . . . for ingress into the country but is not a formal "admission".'" *Id.* (quoting *Chi Thon Ngo v. INS*, 192 F.3d 390, 392 n.1 (3d Cir. 1999)).

3

parole to be permitted to reenter the United States upon her return on November 28, 2002.

On April 28, 2004, Cheruku's application for adjustment of status under the LIFE Act was denied because her travel outside of the country rendered her inadmissible for a period of ten years under 8 U.S.C. § 1182(a)(9)(B)(i)(II), commonly referred to as the ten-year bar. She filed a petition to reopen, which was denied on August 5, 2004. On August 31, 2004, Cheruku was served with a Notice to Appear charging her with being removable under the ten-year bar, 8 U.S.C. 1182(a)(9)(B)(i)(II), because she had accrued more than one year of unlawful presence in the United States, departed the United States, and subsequently sought admission within ten years of her departure.[3]

In removal proceedings, Cheruku renewed her application for adjustment of status. The Immigration Judge initially held he lacked jurisdiction over the adjustment application because Cheruku was an arriving alien. In response, Cheruku appealed to the BIA. The BIA remanded proceedings to the IJ in light of intervening case law that permits immigration judges to adjudicate certain adjustment applications. The IJ denied Cheruku's application on February 27, 2008, and granted her request for voluntary departure. Cheruku timely appealed to the BIA.

Before the BIA, Cheruku made several arguments: first, that the LIFE Act waived the statutory bar to admissibility; second, that the circumstances of her departure and return were factually distinguishable from those at issue in prior BIA precedents; third, that the Department of

---

[3] Cheruku concedes she is inadmissible under this provision.

Homeland Security (DHS) should be equitably estopped from finding her inadmissible, or in the alternative, that she should be afforded retroactive, *nunc pro tunc*, equitable relief; and finally, that the grant of an advanced parole should require DHS to disregard her departure.

The BIA denied Cheruku's appeal on December 18, 2009. In its decision, the BIA relied on its opinion *In re Lemus-Losa*, 24 I. & N. Dec. 373, 379-80 (BIA 2007), in which it held aliens inadmissible under § 1182(a)(9)(B)(i)(II) are ineligible for adjustment of status under the LIFE Act. The BIA noted the United States Court of Appeals for the Seventh Circuit had called *Lemus-Losa* into question, *see Lemus-Losa v. Holder*, 576 F.3d 752 (7th Cir. 2009), but reiterated its understanding of the statutes as set forth in *Lemus-Losa*, 24 I. & N. Dec. 373. In addition, the BIA emphasized the advanced parole document issued to Cheruku explicitly warned that if she were to leave the United States, she could be found inadmissible upon her return. The BIA accordingly rejected Cheruku's equitable estoppel argument, finding no misconduct on the part of DHS. The BIA also rejected Cheruku's request for retroactive relief stating it was precluded by statute from creating a retroactive waiver of inadmissibility, and it rejected her argument that the advanced parole document should render her departure a nullity. Consequently, the BIA affirmed the Immigration Judge's conclusion that Cheruku was ineligible for adjustment of status, and granted her request for voluntary departure.

Cheruku timely petitioned for review of the BIA's decision and renews her arguments on appeal.

**II.**

5

The BIA had appellate jurisdiction over Cheruku's removal proceeding under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15. We have jurisdiction to review final orders of removal under the Immigration and Nationality Act (INA), 8 U.S.C. § 1252(a).

Because the BIA issued a fully reasoned opinion, we review the BIA's opinion as the final agency decision. *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 106 (3d Cir. 2010). We review questions of law, such as the BIA's interpretation of immigration statutes, *de novo*, "including both pure questions of law and applications of law to undisputed facts," *Rranci v. Att'y Gen.*, 540 F.3d 165, 171 (3d Cir. 2008), "subject to the principles of deference articulated in *Chevron v.* [*NRDC*, 467 U.S. 837, 844] (1984)," *Kaplun v. Att'y Gen.*, 602 F.3d 260, 265 (3d Cir. 2010).

"The BIA's construction of the statute is entitled to deference and must be accepted by the Court if it is based upon a permissible construction of the statute." *Filja v. Gonzales*, 447 F.3d 241, 252 (3d Cir. 2006) (citing *Chevron*, 467 U.S. at 842-43). Such deference is "especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation omitted).

We conduct a two-part inquiry, first asking "whether 'the statute is silent or ambiguous with respect to the specific issue' before [us]." *Id.*, at 424 (quoting *Chevron*, 467 U.S. at 843). If the statute's language is clear and unambiguous, we uphold the plain meaning of the statute. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 432-33 & n.12 (1987). But if the statute is silent or ambiguous, "'the question for the court [is]

6

whether the agency's answer is based on a permissible construction of the statute.'" *Aguirre-Aguirre*, 526 U.S. at 424 (quoting *Chevron*, 467 U.S. at 843). When the ambiguity is implicit, "if the [BIA's] construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

## III.

### A.

On appeal, Cheruku challenges the BIA's determination that her inadmissibility under 8 U.S.C. § 1182(a)(9)(B)(i)(II) precludes her adjustment of status under the LIFE Act, 8 U.S.C. § 1255(i). In support, she contends the LIFE Act waives the statutory ten-year bar to admissibility. Conversely, the Government contends the conflict between the provisions of the LIFE Act and certain grounds for inadmissibility introduces ambiguity into the statutory scheme and, consequently, that we owe deference to the BIA's reasonable statutory interpretation.

### 1.

Our first task is to determine whether the statutory scheme is ambiguous. *Aguirre-Aguirre*, 526 U.S. at 424. In 1994, Congress amended the INA by adding a new section—245(i), codified as 8 U.S.C. § 1255(i)—otherwise known as the LIFE Act. *In re Briones*, 24 I. & N. Dec. 355, 358-61 (BIA 2007). The LIFE Act was enacted to permit certain aliens unlawfully present in the United States to apply to

7

adjust their statuses to that of lawful permanent residents without having to undergo consular inspection and admission abroad.[4] *See Briones*, 24 I. & N. Dec. at 359-61. On its face,

---

[4] In relevant part, § 1255(i) reads:

> **(i)** Adjustment in status of certain aliens physically present in United States
>> **(1)** Notwithstanding the provisions of subsections (a) and (c) of this section, an alien physically present in the United States—
>>> **(A)** who—
>>>> **(i)** entered the United States without inspection; or
>>>> **(ii)** is within one of the classes enumerated in subsection (c) of this section;
>>> **(B)** who is the beneficiary (including a spouse or child of the principal alien, if eligible to receive a visa under section 1153(d) of this title) of—
>>>> **(i)** a petition for classification under section 1154 of this title that was filed with the Attorney General on or before April 30, 2001; or
>>>> **(ii)** an application for a labor certification under section 1182(a)(5)(A) of this title that was filed pursuant to the regulations of the Secretary of Labor on or before such date; and
>>> **(C)** who, in the case of a beneficiary of a petition for classification, or an

§ 1255(i)(2)(A) of the LIFE Act requires an alien to be "admissible" to the United States in order to qualify for adjustment.

In 1997, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208 § 301, 110 Stat. 3009-546, 3009-577-78 (1997),

---

> application for labor certification, described in subparagraph (B) that was filed after January 14, 1998, is physically present in the United States on December 21, 2000;
>
> may apply to the Attorney General for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence
>
> . . . .
>> **(2)** Upon receipt of such an application and the sum hereby required, the Attorney General may adjust the status of the alien to that of an alien lawfully admitted for permanent residence if—
>>> **(A)** the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and
>>> **(B)** an immigrant visa is immediately available to the alien at the time the application is filed.
>
> . . . .
>
> Congress later amended the section, extending its expiration date, and adding additional requirements. *See Padilla-Caldera v. Holder*, 637 F.3d 1140, 1148 n.7 (10th Cir. 2011).

which, among other things, added several statutory provisions to the INA rendering certain groups of aliens inadmissible. *See Briones*, 24 I. & N. Dec. at 358. Section 1182(a)(6)(A)(i) of the INA, added by IIRIRA, generally renders inadmissible those who are "present in the United States without being admitted or paroled, or who arrive[] in the United States at any time or place other than as designated by the Attorney General." Congress also added other, more specific, bars to admissibility when it enacted IIRIRA. The provisions of § 1182(a)(9)(C) render inadmissible aliens having certain prior immigration violations, and the provisions of § 1182(a)(9)(B) render inadmissible for a period of time aliens who have accrued a period of unlawful presence.

The adjustment provisions of § 1255(i) are clearly in tension with the bars to admissibility set forth in § 1182(a)(6)(A)(i). Further complicating matters, the prefatory language of § 1182(a) states that "[e]xcept as otherwise provided in this chapter, aliens who are inadmissible . . . are ineligible to be admitted to the United States." Unless this "savings clause" is applied, a straightforward application of § 1182(a)(6)(A)(i) would render the LIFE Act a nullity by barring from adjustment any individual not admitted or paroled. *See Mora v. Mukasey*, 550 F.3d 231, 237-38 (2d Cir. 2008). Because we are "unable to infer from the statutory language the way in which 1255(i) implicitly waives unlawful presence as a ground for inadmissibility," we join with our sister circuits in finding the statute ambiguous. *Herrera-Castillo v. Holder*, 573 F.3d 1004, 1008 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 3505 (2010); *see also Garfias-Rodriguez v. Holder*, No. 09-72603, --- F.3d ----, 2011 U.S. App. LEXIS 7406, at *15 (9th Cir. Apr. 11, 2011); *Padilla-Caldera v. Holder*, 637 F.3d 1140, 1148 (10th Cir. 2011);

*Ramirez v. Holder*, 609 F.3d 331, 336 (4th Cir. 2010); *Renteria-Ledesma v. Holder*, 615 F.3d 903, 908 (8th Cir. 2010); *Villanueva v. Holder*, 615 F.3d 913, 915 (8th Cir. 2010); *Mora*, 550 F.3d at 237-38; *Ramirez-Canales v. Mukasey*, 517 F.3d 904, 908 (6th Cir. 2008); *Mortera-Cruz v. Gonzales*, 409 F.3d 246, 253 (5th Cir. 2005).

**2.**

Having found the statute to be ambiguous, we evaluate whether the BIA's interpretation of the statutes is reasonable. *See Brand X Internet Servs.*, 545 U.S. at 980. The BIA has read § 1255(i) as an implicit waiver of inadmissibility under § 1182(a), but only for those aliens who are inadmissible under § 1182(a)(6)(A)(i). *See Briones*, 24 I. & N. Dec. at 365. According to the BIA, "[LIFE Act] adjustment remains available to aliens inadmissible under [1182(a)(6)(A)(i)] only because a contrary interpretation would render the language of [the LIFE Act] so internally contradictory as to effectively vitiate the statute, an absurd result that Congress is presumed not to have intended." *Id.* (citing *Demarest v. Manspeaker*, 498 U.S. 184, 190-91 (1991)).

The BIA has not, however, found the more specific bars to admissibility, added by IIRIRA, to be waived by the LIFE Act. In *Briones*, the BIA also held that adjustment of status under the LIFE Act is unavailable to recidivist immigration violators barred from admission under 8 U.S.C. § 1182(a)(9)(C)(i)(I). *See id.* at 371. Every circuit court of appeals to review the *Briones* decision has upheld it as a reasonable interpretation of the statutory scheme. *See Garfias-Rodriguez*, 2011 U.S. App. LEXIS 7406, at *15; *Padilla-Caldera*, 637 F.3d at 1152; *Ramirez*, 609 F.3d at 337; *Renteria-Ledesma*, 615 F.3d at 908; *Villanueva*, 615 F.3d at

11

915; *Mora*, 550 F.3d at 239; *Ramirez-Canales*, 517 F.3d at 910.

In *Lemus-Losa*, the BIA considered the provision at issue here, which renders inadmissible any alien who "has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States."[5]  8 U.S.C. § 1182(a)(9)(B)(i)(II).  The BIA held aliens who are inadmissible under this provision are ineligible for adjustment of status under the LIFE Act absent the grant of a waiver.  *See Lemus-Losa*, 24 I. & N. Dec. at 378.

The BIA offered several reasons in support of its interpretation.  Notably, the BIA distinguished the specific inadmissibility provisions of § 1182(a)(9)(B)(i)(II) from the more general inadmissibility provision of § 1182(a)(6)(A)(i). *Id.* at 378.  It reaffirmed its conclusion that the general provisions of § 1182(a)(6)(A)(i) would render the LIFE Act a nullity, but it concluded application of the inadmissibility provisions of § 1182(a)(9)(B)(i)(II) would not lead to such an absurd result.  *Id.*  Rather, the BIA explained that unlike § 1182(a)(6)(A)(i), which simply punishes those who enter the country without inspection, the ten-year bar of § 1182(a)(9)(B)(i)(II) "punishes aliens who seek admission . . . after having previously accrued a period of unlawful status." *Id.* at 379.  Consequently, the BIA concluded its interpretation was consistent with the "overall purpose of

---

[5] "Departure" has been read to include any departure, *Lemus-Losa*, 24 I. & N. Dec. at 376-77, and Cheruku does not appear to challenge BIA's construction of "departure."  In fact, Cheruku does not contest her inadmissibility under this provision at all.

[1182(a)(9)] to compound the adverse consequences of immigration violations by making it more difficult for individuals who have left the United States after committing such violations to be lawfully admitted thereafter." *Id.* (quotation omitted).

The BIA also noted that whenever Congress has "extended eligibility for adjustment of status to inadmissible aliens, it has done so unambiguously." *Id.* at 378. In support, the BIA observed Congress had expressly provided a waiver of inadmissibility under § 1182(a)(9)(B) for aliens seeking adjustment of status under the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, 111 Stat. 2193 (1997), and the Haitian Refugee Immigration Fairness Act, Pub. L. No. 105-277, 112 Stat. 2681-538 (1992). *Lemus-Losa*, 24 I. & N. Dec. at 378 & n.5.

The two circuit courts of appeals to have reviewed the BIA's decision in *Lemus-Losa* have reached opposite results. The Tenth Circuit found the statute to be ambiguous and upheld the BIA's interpretation of the statutory scheme as reasonable. *See Herrera-Castillo*, 573 F.3d at 1009. A few weeks later, the Seventh Circuit considered the same issue. It observed that § 1182(a)(9)(C)(i)(I),[6] the provision at issue in

---

[6] This section provides:

> **(i)** In general Any alien who—
> **(I)** has been unlawfully present in the United States for an aggregate period of more than 1 year, or
> **(II)** has been ordered removed under section 1225(b)(1) of this title, section 1229a of this title, or any other provision of law, and who

13

*Briones*, and § 1182(a)(9)(B)(i)(II)[7] "both are triggered by an initial sojourn in the United States that was unlawful," but

enters or attempts to reenter the United States without being admitted is inadmissible.

**(ii)** Exception Clause (i) shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Secretary of Homeland Security has consented to the alien's reapplying for admission.

8 U.S.C. § 1182(a)(9)(C)(i).

[7] This section provides:

**(i)** In general Any alien (other than an alien lawfully admitted for permanent residence) who—

**(I)** was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 1254a(e) of this title) prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, or

**(II)** has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible.

that (C)(i)(I) applies to aliens "who enter[] or attempt[] to reenter the United States without being admitted," while (B)(i)(II) applies to aliens "who again seek[] admission within ten years of the alien's departure or removal from the United States." *Lemus-Losa*, 576 F.3d at 757 (quotations and emphasis omitted). Consequently, in its view, § 1182(a)(9)(B)(i)(II) should be treated analogously to § 1182(a)(6)(A)(i) because "if someone is 'seeking admission' to the United States on that second occasion and has thus demonstrated that he is willing to play by the rules, he is no different from the alien who is physically present in the United States 'without inspection' but who is entitled to apply for LIFE Act relief." *Lemus-Losa*, 576 F.3d at 761. Accordingly, it held the BIA erred because it "did not pay sufficient heed to the difference between § (B)(i)(II), . . . and § (C)(i)(I)," granted the petition for review, and remanded the case to the BIA for further proceedings.[8] *Id.*

**3.**

Cheruku urges us to adopt the Seventh Circuit's position that, on the balance, § 1182(a)(9)(B)(i)(II) is distinguishable from § 1182(a)(9)(C)(i)(I), and should be read analogously to § 1182(a)(6)(A)(i), which the BIA reads as being implicitly waived by the LIFE Act.[9] Relying on

8 U.S.C. § 1182(a)(9)(B)(i)(II)(footnote omitted).

[8] Although the Seventh Circuit noted *Chevron* controlled its analysis, *Lemus-Losa*, 576 F.3d at 755-56, it does not appear to have applied that framework. It neither explicitly found the statute to be ambiguous, nor explicitly held the BIA's interpretation of the statute to be unreasonable.

[9] Cheruku appears to contend in the alternative that *Lemus-Losa* is distinguishable because, unlike the petitioner in

15

*Lemus-Losa*, she stresses that, by applying for and being granted advanced parole, she "demonstrated [she] is willing to play by the rules." The Seventh Circuit's view regarding harsher treatment for those who do not play by the rules has considerable appeal and were we not constrained by *Chevron* we might agree. But principles of deference require a different result.

The BIA reasonably concluded the general inadmissibility provision of § 1182(a)(6)(A)(i) is distinguishable from the more specific provision of § 1182(a)(9)(B)(i)(II). *Lemus-Losa*, 24 I. & N. Dec. at 378. Unlike the bar to admissibility in § 1182(a)(6)(A)(i), application of the ten-year bar does not render the LIFE Act a nullity. *Id.* The group of aliens barred by § 1182(a)(6)(A)(i) simply because they are unlawfully present is not coextensive with the smaller group of aliens barred under § 1182(a)(9)(B)(i)(II) because they accrue a period of unlawful presence, depart, and subsequently return seeking lawful admission within ten years of the departure. An interpretation upholding the § 1182(a)(6)(A)(i) bar would make unlawful presence "'both a qualifying and a disqualifying condition for adjustment of status,'" *Herrera*, 573 F.3d at 1007 (quoting *Briones*, 24 I. & N. Dec. at 362); *see also Lemus-Losa*, 24 I. & N. Dec. at 378, but the same cannot be said for § 1182(a)(9)(B)(i)(II). Thus, no implicit waiver is required to

---

*Lemus-Losa*, who departed the United States and returned through an illegal border crossing, Cheruku traveled on a duly issued advanced parole before seeking admission into the United States. This argument is unavailing. Regardless of the circumstances of departure and return, both petitioners are inadmissible under 8 U.S.C. § 1182(a)(9)(B)(i)(II).

give effect to the words of the statute. Under the BIA's interpretation of the interplay between the ten-year bar and the LIFE Act, the prohibition on departure is a straightforward rule with which aliens seeking adjustment of status must comply—a rule displayed on advanced parole documents such as those issued to Cheruku.

We acknowledge that aliens inadmissible under § 1182(a)(9)(C)(i)(I) who attempt to enter or reenter without being admitted may be more culpable than those under § 1182(a)(9)(B)(i)(II) who are seeking admission, but we do not think this difference undermines the BIA's reasoning that the provisions are similar. Both are specific bars to admissibility as distinguished from the more general provision of § 1182(a)(6)(A)(i). Nor do we think the difference in relative culpability absolves those barred by § 1182(a)(9)(B)(i)(II) of all culpability or leads to the inevitable conclusion that Congress implicitly intended to waive inadmissibility for those aliens. While we may question whether the policy choices furthered by the BIA's interpretation of the statutory scheme are wise, we remain mindful that "the place to resist unwise or cruel legislation touching aliens is the Congress, not th[e] [c]ourt[s]." *Harisiades v. Shaughnessy*, 342 U.S. 580, 598 (1952) (Frankfurter, J., concurring).

We believe the BIA's interpretation of the statutory scheme is reasonable and consistent with Congress's intent. *See Herrera-Castillo*, 573 F.3d at 1009. Under the ten-year bar, an alien with a one-year period of unlawful presence in the U.S. would not be eligible for consular admission and inspection at all during the applicable bar period without a waiver of inadmissibility. As explained by the BIA, the provisions of § 1182(a)(9), including the ten-year bar, were intended to deter aliens who had accrued unlawful presence

17

and then left the United States from later seeking admission. *Lemus-Losa*, 24 I. & N. Dec. at 379. But the LIFE Act still permits adjustment for an eligible alien who has accrued a period of unlawful presence provided he or she does not depart the United States before seeking admission. Although this may sometimes lead to a harsh result, Congress has provided some relief by granting the Attorney General discretion to waive inadmissibility to accommodate family unity in certain circumstances. 8 U.S.C. § 1182(a)(9)(B)(v). We accord deference to the BIA's conclusion that "the language and structure of the relevant statutes[,] along with Congress's specific waivers in certain instances," *Herrera-Castillo*, 573 F.3d at 1009, best effectuates IIRIRA's goals, *Lemus-Losa*, 24 I. & N. Dec. at 379, as well as the LIFE Act's remedial purposes of lifting administrative burdens by facilitating processing of aliens physically present in the United States, and of promoting family unity, *Briones*, 24 I. & N. Dec. at 360-61; *Lemus-Losa*, 24 I. & N. Dec. at 378. Therefore we defer to the BIA's interpretation of the statutory scheme.

## B.

Cheruku also contends the DHS is equitably estopped from denying her admission, or in the alternative, the BIA erred in determining equitable retroactive relief was unavailable to mitigate the harsh result of this case. Neither argument has merit.

Cheruku contends the DHS should be estopped from denying her admission because she was deceived into believing the advanced parole would immunize her against a later finding of inadmissibility. To prevail, Cheruku must show that the DHS made a misrepresentation upon which she

18

reasonably relied to her detriment, and that the DHS engaged in affirmative misconduct. *See Mudric v. Att'y Gen.*, 469 F.3d 94, 99 (3d Cir. 2006). Regardless of how Cheruku interpreted the advanced parole document, the words on the document clearly stated:

> If, after April 1, 1997, you were unlawfully present in the United States for more than 180 days before applying for adjustment of status, you may be found inadmissible under section 212(a)(9)(B)(i) of the Act when you return to the United States to resume the processing of your application. If you are found inadmissible, you will need to qualify for a waiver of inadmissibility in order for your adjustment of status application to be approved.

The document explicitly warned Cheruku that by traveling on the advanced parole, she may render herself inadmissible.[10] Accordingly, she has failed to demonstrate any misrepresentation or affirmative misconduct by DHS. Cheruku was mistaken concerning the consequences of departing the United States under her advanced parole. While regrettable, this cannot form the basis of an equitable estoppel claim.

---

[10] Cheruku also appears to argue that the BIA should treat travel on an advanced parole as if the travel never occurred. The advanced parole clearly anticipates travel, as well as possible effects on an alien's admissibility as a result of travel. Cheruku cites no authority in support of her assertion, and there is no basis for us to conclude that travel on an advanced parole should be excused.

19

Nor can we say the denial of retroactive equitable relief was in error. Retroactive relief, often referred to as *nunc pro tunc* relief, has "long [been] employed by the immigration authorities, based on what they believe to be implied statutory authority to provide relief from the harsh provisions of the immigration laws in sympathetic cases." *See Gonzalez-Balderas v. Holder*, 597 F.3d 869, 870 (7th Cir. 2010) (citing *Patel v. Gonzales*, 432 F.3d 685, 693 (6th Cir. 2005); *Edwards v. INS*, 393 F.3d 299, 308-09 (2d Cir. 2004)). But the BIA has generally limited the grant of orders *nunc pro tunc* to a few limited circumstances. It appears to have granted such retroactive relief only to permit the exercise of discretion to allow an alien to reapply for admission, to apply the law as it existed when the alien violated the immigration laws, *Ramirez-Canales*, 517 F.3d at 910, or to correct an error in immigration proceedings, *Edwards*, 393 F.3d at 309.

Here, the BIA concluded *nunc pro tunc* relief was unavailable based on its decision in *In re Torres-Garcia*, 23 I. & N. Dec. 866, 876 (BIA 2006). In *Torres-Garcia*, the BIA held that because the statutory provisions of § 1182(a)(9) of the INA clearly delineate the limited conditions under which the DHS has the discretion to grant waivers of inadmissibility, grant of a de facto waiver not specified by statute would be inconsistent with congressional intent. *Id.* at 874-76. Specifically, *Torres-Garcia* rejected the contention that the waiver provision of 8 C.F.R. § 212.2 granted discretion to waive inadmissibility under § 1182(a)(9)(C)(i).[11] *Id.* at 876. This interpretation has been affirmed by circuits that have considered the issue. *See Gonzalez-Balderas*, 597

---

[11] As noted, §§ 1182(a)(9)(B) & (C) were both added to the INA when Congress enacted IIRIRA.

F.3d at 869-71; *Delgado v. Mukasey*, 516 F.3d 65, 73 (2d Cir. 2008); *Gonzales v. DHS*, 508 F.3d 1227, 1241-42 (9th Cir. 2007).

Cheruku does not contend the regulations in 8 C.F.R. § 212.2 authorize the grant of a waiver. Nor does she contend her case falls within any of the traditional categories for which the BIA has granted *nunc pro tunc* relief. Rather, she simply contends without support that the BIA could have exercised equitable relief. But "[a] court may not award equitable relief in contravention of the expressed intent of Congress." *Edwards*, 393 F.3d at 309 (citing *INS v. Pangilinan*, 486 U.S. 875, 883-85 (1988)). As noted, Cheruku was found inadmissible under § 1182(a)(9)(B)(i)(II). Section 1182(a)(9)(B)(i)(II)(iii) delineates exceptions to inadmissibility, and § 1182(a)(9)(B)(v) expressly sets forth the conditions under which the DHS may waive inadmissibility, which pertain exclusively to family unity. Cheruku is not eligible for any statutory waiver to inadmissibility since her adjustment application relies on her work status rather than on any family connection. Accordingly, because Congress clearly delineated the situations in which the Attorney General may exercise discretion to grant a waiver to inadmissibility under this section, the BIA did not err in holding equitable *nunc pro tunc* relief is foreclosed by the plain language of the statute.[12] *See Gonzalez-Balderas,* 597 F.3d at 870 ("The statute is clear and the Board's ruling correct . . . ."); *Ramirez*, 609 F.3d at 337 n.7 (rejecting without discussion petitioner's arguments

---

[12] We note that even if there were ambiguity on this point, we would find the BIA's interpretation to be reasonable.

21

that remand should be granted to remedy the BIA's denial of *nunc pro tunc* relief).

## IV.

For the foregoing reasons, we will affirm the judgment of the BIA and deny the petition for review.

McKee, *Chief Judge*, concurring.

Although I agree that Cheruku is inadmissible for adjustment of status under a strict interpretation of 8 U.S.C. § 1182(a)(9)(B)(i)(II) as explained by my colleagues, I write separately because the result we must reach is as unjust as it is unreasonable.[1]

Cheruku is an educated software engineer who is employed and her employer is trying to help her remain in the United States. (A.R. 66, 333). She is a highly skilled professional who, according to her employer, is engaged in "research, design, and develop[ment] [of] software and programs for high tech medical, industrial, scientific, financial business applications, lead[ing] teams of programmers and systems analysts in projects," and "develop[ing] and direct[ing] systems testing procedures, programming and documentation." (A.R. 258). She has no criminal record, nor can she be characterized as the type of "recidivist immigration violator" that Congress appropriately seeks to exclude from this country. 8 U.S.C. § 1182(a)(9)(C)(i).

Moreover, nothing on this record suggests that Cheruku has done anything other than pay all applicable taxes while employed here, and she clearly has a demonstrated skill in a highly specialized field that this country needs to be competitive in several important industries. (A.R. 263-69). In addition, Cheruku's continued presence in this country does not portend any drain on social resources. In short, as her employer's affidavit suggests, she appears to be exactly the kind of person the United States should welcome. (A.R. 258).

Cheruku did not enter the United States illegally. Rather, she arrived on a visitor's visa, and then re-entered the country in 2002 pursuant to a grant of advanced parole.

---

[1] According to the I-485 adjustment of status application, the petitioner's full name is "Shireesha Reddy Cheruku," not "Reddy Shireesha" as the IJ and BIA both stated in their respective decisions. (A.R. 82, 86). We will therefore refer to the petitioner by her last name, Cheruku.

1

Although she overstayed her original visa, she later made a concerted effort to "play by the rules" by applying for advanced parole with the assistance of counsel.

Ironically, it seems quite likely that Cheruku only left the country in the first place because the United States gave her permission to return. The Government now seeks to remove her because she left the country after she applied for, and received, a document from the Government explicitly allowing her to leave. As the Immigration Judge quite correctly observed, the advanced parole document she was given was "at best a schizophrenic document," because on one hand "[i]t says we're going to allow you to do something, but then we might change our mind and not allow you to do it or something like that. You can always leave, but you might not be able to get back." (A.R. 76).

Yet, as my colleagues explain, the statute says what it says and it is not our job to rewrite what Congress has decreed unless a literal application of the statute would "lead to a patently absurd result that no rational legislature could have intended." *Barrios v. Att'y Gen.* 399 F.3d 272 (3d Cir. 2005). Although I do not think that is the general case here and therefore do not dissent from the majority opinion, I nevertheless think that as applied to Cheruku, the result we reach today suggests the wisdom of Charles Dickens' condemnation of the law that was uttered by Mr. Bumble in *Oliver Twist.*[2]

The majority correctly points out that Cheruku was technically placed on notice that her immigration status could be in jeopardy if she left the country because of the warning on her advanced parole document. That warning states:

> NOTICE TO APPLICANT: Presentation of this authorization will permit you to resume your application for adjustment of status upon your

---

[2] Mr. Bumble is the despicable character in *Oliver Twist* who said: "if the law supposes that, then the law is [absurd]." Bumble's actual quote is far more expressive and irreverent.

return to the United States. If your adjustment application is denied, you will be subject to removal proceedings under section 235(b)(1) or 240 of the Act. If after April 1, 1997, you were unlawfully present in the United States for more than 180 days before applying for adjustment of status, you may be found inadmissible under section 212(a)(9)(B)(i) of the Act when you return to the United States to resume the processing of your application. If you are found inadmissible, you will need to quality for a waiver of inadmissibility in order for your adjustment of status application to be approved.

I am not at all sure that someone who is born in the United States and is fluent in English could comprehend this warning. I am far less certain that someone in Cheruku's situation could. The language is confusing and ambiguous as the Immigration Judge explained. The phrase: "presentation of this authorization **will** permit you to resume your application," (emphasis added), leads one to believe that Cheruku should indisputably have been able to pick up where she left off with her adjustment of status application once she returned to the United States. However, the warning then states, "you **may** be found inadmissible" (emphasis added). The latter implies that Cheruku may not be admissible under some unknown statute, but just as equally implies that she may very well be found admissible. The fact that "will" precedes "may" could easily mislead a person to believe that his/her adjustment of status would not be adversely affected by a departure. The situation is further complicated by the fact that there is no explanation of what section 235(b)(1) or 240 of the Act or section 212(a)(9)(B)(i) mean. Nor is there any information about how these statutes could impact a person's adjustment of status application. As a matter of law, Cheruku is, of course, charged with understanding the convoluted and hyper technical language on the form she received, but Mr. Bumble's proclamation summarizes the reality of the situation.

3

Nevertheless, although I am troubled by our decision today, I am cautiously optimistic that our decision may not foreclose Cheruku's ability to remain here nor deprive this country of her talents.  On August 18, 2011, the Department of Homeland Security issued a letter and accompanying guidelines announcing that it plans to better focus its limited resources on deporting a more select (and appropriate) group of aliens.  *See* DHS Letter to Senators Regarding Shift In Policy on Immigration Enforcement (Aug. 18, 2011), available                                                at http://www.ilw.com/immigrationdaily/news/2011,0819-prosecutorialdiscretion.pdf.    Cheruku is not in the class of aliens that the Government's immigration efforts will be focused on.  Rather,  DHS will now concentrate its resources on "enhancing border security and identifying and removing criminal aliens, those who pose a threat to public safety and national security, repeat immigration law violators and other individuals prioritized for removal."  *Id*. at 1.  As part of this new strategy, DHS has initiated an interagency working group to "execute a case-by-case review of all individuals currently in removal proceedings to ensure that they constitute our highest priorities."  *Id*. at 2.  I can only hope that Cheruku will be afforded such review and that the result will be favorable to her.

My optimism in that regard is buttressed by a memorandum issued by U.S. Immigration and Customs Enforcement  proving guidance to "ICE" law enforcement personnel and attorneys for the exercise of discretion in removing aliens.  *See* Memorandum Regarding Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency (June 1, 2011), available at http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.  Some of the discretionary factors that ICE will consider include the person's criminal history or lack thereof, whether the person is otherwise likely to be granted temporary or permanent status or other relief from removal, and the person's length of presence in the United States.  Although it is certainly not our place to tell an administrative agency how to apply its policies, I do note that it appears that Cheruku would qualify for a favorable exercise of discretion under the new policy

given her lack of criminal background, her employer's desire that she continue working as a software engineer,  and her residence in the United States for the last 16 years.

As early as 1875, the Supreme Court discussed the value that immigrants bring to this country's work force.  The Court explained, "[i]n addition to the wealth which some of them bring, they bring still more largely the labor which we need to till our soil, build our railroads, and develop the latent resources of the country in its minerals, its manufactures, and its agriculture." *Henderson v. Mayor of City of New York*, 92 U.S. 259, 270 (1875).  Of course, times have changed greatly since then.  The time for building railroads has come and gone and the need for manual labor is now dwarfed by the need for expertise in the scientific and technological disciplines.

Nevertheless, the Court's original premise is just as true today as it was 130 years ago.  Indeed, given the rise of the "global village," the interdependent nature of  "national" economies, and the global competition in the marketplace, the need for highly specialized expertise is perhaps even greater now than the need for manual labor was when the Court made its observation in *Henderson*.

Given the finite resources of law enforcement and immigration officials, as well as overburdened immigration dockets, it is my hope that the Department of Justice may yet decide that Cheruku can remain in the United States and continue to function as a contributing member of this society.